## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **OBINA ONYIAH** | : | |
| **805 ST. CHRISTOPHER LANE** | : | **CIVIL ACTION** |
| **PHILADELPHIA, PA 19116** | : | |
| **Plaintiff** | : | |
| **v.** | : | |
| **CITY OF PHILADELPHIA** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | |
| **PHILADELPHIA, PA. 19102** | : | |
| **and** | : | |
| **FORMER COMMISSIONER** | : | |
| **CHARLES RAMSEY** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | |
| **PHILADELPHIA, PA. 19102** | : | |
| **and** | : | |
| **POLICE CAPTAIN/LIEUTENANT** | : | |
| **JOHN DOE 1-5** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | |
| **PHILADELPHIA, PA. 19102** | : | |
| **and** | : | |
| **FORMER DETECTIVE JAMES PITTS** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | |
| **PHILADELPHIA, PA. 19102** | : | |
| **and** | : | |
| **DETECTIVE OHMARR JENKINS** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | |
| **PHILADELPHIA, PA. 19102** | : | |
| **and** | : | |
| **DETECTIVE THORSTON LUCKE** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | |
| **PHILADELPHIA, PA. 19102** | : | |
| **and** | : | |
| **DETECTIVES/POLICE OFFICERS** | : | |
| **JOHN DOE 1-10** | : | |
| **1515 ARCH STREET, 15TH FL.** | : | **No.  22-1556** |
| **PHILADELPHIA, PA. 19102** | : | |
| **Defendants** | : | |

## AMENDED CIVIL COMPLAINT

## I.        Introduction

1.  Plaintiff brings the action for damages pursuant 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution,  against Defendants Former Police Commissioner Charles Ramsey, Police Captain/Lieutenant John Doe 1-5, Former Detective James Pitts, Detective Ohmarr Jenkins, Detective Thorston Lucke, and Detectives/Police Officers John Doe 1-10, in their individual and/or official capacities, in addition to Defendant City of Philadelphia, as the result of Defendants' unconstitutional coercion of a false confession by assault and battery, resulting in the malicious prosecution of Plaintiff. After Plaintiff was incarcerated for eleven (11) years, the District Attorney's Office Conviction Integrity Unit investigated Plaintiff's case. As a result, Plaintiff's conviction was overturned. At the time of filing, Defendant Former Detective James Pitts has been arrested and charged with perjury for his testimony and misconduct relating to Plaintiff's criminal prosecution and resulting imprisonment.

## II.        Jurisdiction and Venue

2.  The court has jurisdiction over the Federal Law Claims pursuant to 28 U.S.C. §1331 and §1343 and jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367 and the principals of pendant and ancillary jurisdiction.

3.  Venue is proper under 28 U.S.C. §1391(b) because the cause of action upon which the complaint is based arose in Philadelphia, Pennsylvania, within Philadelphia County, which is in the Eastern District of Pennsylvania.

## III.        Parties

4.  Plaintiff, Obina Onyiah, is an adult resident of Pennsylvania, residing as captioned.

5.  Defendant, City of Philadelphia, is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania, with a main office/principal place of business located as captioned.

6.  At all relevant times, Defendant City of Philadelphia acted or failed to act by and through its agents, servants, and/or employees then and there acting within the course and scope of their agency, servanthood, and/or employment and under color of state law.

7.  Defendant, Former Police Commissioner Charles Ramsey, was, at all relevant times, the highest ranking officer in the Philadelphia Police Department ("PPD") and employed by Defendant City of Philadelphia and/or the Philadelphia Police Department, responsible for overseeing the conduct of the Philadelphia Police Department, including, but not limited to, Captain/Lieutenant John Doe 1-5, Former Detective Pitts, Detective Jenkins, Detective Lucke, and Detectives/Police Officers John Doe 1-10, and had authority regarding the conduct and discipline of agents, servants, and/or employees of the Philadelphia Police Department, and is being sued in his official capacity.

8.  Defendant, Police Captain/Lieutenant John Doe 1-5, who at this time are currently unidentified, were, at all relevant times, supervising and/or ranking officers in the Philadelphia Police Department and employed by Defendant City of Philadelphia and/or the Philadelphia Police Department, responsible for overseeing the conduct of members of the Philadelphia Police Department, including, but not limited to, Former Detective Pitts, Detective Jenkins, Detective Lucke, and Detectives/Police Officers John Doe 1-10, and had authority regarding the conduct and discipline of agents, servants, and/or employees of the Philadelphia Police Department, and are being sued in their official capacity.

9. Defendant, Former Detective James Pitts, was at all material times employed as a detective with City of Philadelphia Police Department, and is being sued in his individual capacity.

10. Defendant, Detective Ohmarr Jenkins, was at all material times employed as a detective with City of Philadelphia Police Department, and is being sued in his individual capacity.

11. Defendant, Detective Thorston Lucke, was at all material times employed as a detective with City of Philadelphia Police Department, and is being sued in his individual capacity.

12. Defendants, Detectives/Police Officers John Doe 1-10, who at this time are currently unidentified, were at all material times employed as detectives and/or police officers with City of Philadelphia Police Department, and are being sued in their individual capacities.

13. Defendants, Police Captain/Lieutenant John Doe 1-5, Former Detective Pitts, Detective Jenkins, Detective Lucke, and Detectives/Police Officers John Doe 1-10, were at all relevant times Detectives employed by Defendant, City of Philadelphia and/or the Philadelphia Police Department Homicide Unit.

14. At all relevant times, Defendants, Police Captain/Lieutenant John Doe 1-5, Former Detective Pitts, Detective Jenkins, Detective Lucke, and Detectives/Police Officers John Doe 1-10, were acting within the course and scope of their employment and under color of state law pursuant to the statutes, regulations, ordinances, rules, practices, policies, and customs of Defendant, City of Philadelphia, as well as the Philadelphia Police Department and the Commonwealth of Pennsylvania.

15. Defendants, City of Philadelphia, Former Commissioner Charles Ramsey, and Police Captain/Lieutenant John Doe 1-5, were, at all material times, charged with the responsibility of testing, hiring, training, supervising, and disciplining members of the Philadelphia Police

Department, including Former Detective Pitts, Detective Jenkins, Detective Lucke, and Detectives/Police Officers John Doe 1-10.

16. At all relevant times, Defendants, City of Philadelphia, Former Commissioner Charles Ramsey, and Police Captain/Lieutenant John Doe 1-5, acted or failed to act by and through its agents, servants, employees, workmen, police officers, and/or detectives, then and there acting within the course and scope of their agency, servanthood, and employment and under color of state law.

### IV.    Operative Facts

17. This suit arises from the wrongful conviction of Plaintiff, Obina Onyiah, for homicide.

*The Crime which Plaintiff was Wrongfully Convicted of.*

18. The crime for which Plaintiff was wrongfully convicted of occurred on October 21, 2010, where two men attempted to commit a robbery in a jewelry store in Philadelphia, Pennsylvania.

19. During the course of the attempted robbery, the owner of the store, William Glatz, shot and killed one of the robbers, identified as Kevin Turner, but was then shot and killed himself.

20. At some point during the course of the attempted robbery and homicide, the second man fled the scene.

*The Initial Investigation after the Crime Occurred.*

21. Three witnesses were present at the time of the robbery: Eric Steiss, Margret Colbridge, and Paul Brewington.

22. Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, employed by City of Philadelphia and/or the Philadelphia Police Department, interviewed several witnesses within hours of the commission of the crime.

23. The three witnesses gave their statements to the aforementioned Defendant detectives, giving physical descriptions of the now-deceased Turner and the man who fled the scene within hours of witnessing the crime.

24. Colbridge described Turner as older, heavier, and taller than the men who fled the scene: 20 to 25 years old, around 200 pounds, and between 5'11" and 6' tall.

25. Brewington also described Turner as older and heavier than the second man: around 30 years old and between 225 to 250 pounds.

26. Turner was measured at 6'1" tall during the autopsy.

27. All three of the witness who were present at the jewelry store described the second man as smaller and younger than Turner: between 5'7" and 5'8" with a thin build and under 20 years old.

28. A fourth witness, Suzanna Duffy, was interviewed on the day of the robbery who witnessed the second man fleeing from the store; she also described him as a young man between 19 and 20 years old with a thin build and around 5'8" tall.

29. Plaintiff is 6'3" tall.

30. At some point during the relevant time, Defendant, Detective Lucke, compiled frames from the surveillance video and extracted a still from the video to show witnesses and/or people who knew Plaintiff in order to get an identification.

31. The still from the surveillance extracted by Defendant, Detective Lucke, depicted only the profile of the head of the man who fled the jewelry store at the relevant time.

32. Defendant, Detective Lucke, testified there was no way to calculate the heights of the people in the surveillance video; furthermore, the aforementioned Defendant refused to make any height comparisons about the suspects in the video at trial.

*Defendant Detectives Investigate the First Suspect.*

33. Two days after the homicide, on October 23, 2010, Raneisha Carter contacted the police because she saw a still photo which, upon information and belief, was extracted by Defendant, Detective Lucke, in the newspaper, and identified the man who fled the jewelry store as Donte Waters, who is the father of her child.

34. At the relevant time, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, began investigating Mr. Waters' possible connection with the crime which occurred on October 21, 2010.

35. Waters has similar facial features as Plaintiff, sharing similar dark complexions, as well as prominent noses and lips.

36. The aforementioned Defendants provided two witnesses, Colbridge and Stress, a photo array which included Waters' picture.

37. Streiss identified Waters as the person who fled the jewelry store, and Colbridge identified Waters but said "I can't say that his hair looks like this because he was wearing a baseball cap."

38. The Defendant detectives verified that Waters was not incarcerated on the day of the homicide, obtained Waters' criminal history, which included a robbery conviction in 2008, and found that his height was reported as 5'9".

39. Using the two positive identifications and the corroborating information from their investigation, the Defendant detectives obtained a search warrant for Waters' residence on October 24, 2010, finding clothing and a hat consistent with the descriptions of the robbery suspect by eyewitnesses.

40. However, there is no documentation that Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, questioned Waters.

*Jailhouse Informant Implicates Plaintiff.*

41. On October 25, 2010, Donnell Cheek, who was incarcerated at a federal detention center, had his girlfriend contact the Homicide Unit Detectives, and spoke to Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10.

42. Cheek claimed he has information about the homicide case, and with permission from his attorney, the aforementioned Defendant Detective John Doe 1-10 interviewed Cheek on November 4, 2010.

43. Cheek claimed that he knew Plaintiff, nicknamed "Beans," since 1997, and he identified him as the suspect who fled the jewelry store on October 21, 2010, because the surveillance video played on the TV three times at the jail.

44. Based on the information provided by Cheek, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, obtained a search warrant on November 7, 2010, for Plaintiff's mother's house.

45. Because of Cheek's cooperation in this investigation, the U.S. Attorney's Office offered to file a motion reducing Cheek's federal sentence pursuant to a federal plea and cooperation agreement previously entered into on September 29, 2010.

*The Defendants Investigate Plaintiff.*

46. On November 8, 2010, at 6:09 am, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, executed the search warrant of Plaintiff's mother's house and only seized Plaintiff's learner's permit application.

47. On that day at approximately 8:00 am, Plaintiff's sister, Christine Onyiah, was taken to the Philadelphia 7th Police District and then transported to the Homicide Detectives' Unit to give a

statement to Defendants, Former Detective Pitts, Detective Jenkins, and/or Detectives/Police Officers John Doe 1-10.

48. Although Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, documented in a 75-48 investigation report that they interviewed Christine Onyiah, the aforementioned Defendants did not document their interview with the Plaintiff's sister; instead, the homicide file contained a written statement from Defendants, Former Detective Pitts and Detective Jenkins, dated November 8, 2010, at 10:10 am, only summarizing the interview.

49. According to the statement given by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, the Plaintiff's sister allegedly gave the aforementioned Defendants information about the Plaintiff's whereabouts, provided them with his contact information, and identified the Plaintiff as the person in the photograph from the jewelry store's surveillance footage.

50. At all relevant times, the photograph provided by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, was from a still of the jewelry store's surveillance footage depicted the profile of the head of the man who fled the scene.

51. Additionally, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, stated that the Plaintiff's sister called him to meet on Frankford Avenue under police surveillance.

52. Plaintiff's sister denied identifying Plaintiff in the photograph and said that the Defendants told her that she needed to set up this meeting so her brother would be safe.

*Defendants Search Plaintiff's Girlfriend's House*

53. On November 8, 2010, at some point in the late morning or early afternoon, police officers, homicide detectives, and/or Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, arrived at Katherine Cardona's house.

54. At all relevant times, Cardona was Plaintiff's girlfriend.

55. During the relevant time, one of Cardona's friend Robert "Chaz" Iezzi, Jr., and her landlord, Anthony Brown, were at her house when the police officers, homicide detectives, and/or Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, arrived.

56. Cardona gave consent to the aforementioned police officers, detectives, and/or Defendants to search her house, and she and her guests were escorted outside while the search was conducted.

57. One of the aforementioned police officers, detectives, and/or Defendants repeatedly stated that he knew that there were guns and money in the house.

58. No guns were recovered on Plaintiff, nor in any of the residences that Defendants searched.

59. After the search, the police officers, homicide detectives, and/or Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, brought Cardona, Iezzi, and Brown back to the Homicide Unit at approximately 3:00 pm.

60. Iezzi was placed in handcuffs when he was transported to the Homicide unit and was not allowed to call anyone.

61. Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, did not place Cardona, Brown, and Iezzi's names in the daily Homicide Unit log.

*Defendants Arrest Plaintiff and Coerce a False Confession.*

62. After her interview with Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10,  Plaintiff's sister went to meet Plaintiff outside of a McDonald's Restaurant on Frankford Avenue in Philadelphia, Pennsylvania.

63. When Plaintiff arrived to meet his sister, police officers, homicide detectives, and/or Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, took custody of the Plaintiff.

64. At approximately 3:20 pm on November 8, 2010, police officers, homicide detectives, and/or Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, arrived at the Homicide Unit with Plaintiff.

65. Plaintiff sat in a chair, handcuffed to a table in the interrogation room for approximately seven and a half (7 ½) hours before Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, began interrogating him.

66. Cardona and Brown were placed on a bench approximately 30 feet away from where Plaintiff was detained, and Iezzi was brough to a room next to where Plaintiff was held.

67. Cardona was brought back to an interrogation room by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, where she was told Plaintiff was wanted for murder.

68. Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, told Cardona not to cover for Plaintiff because she was "fucking him" and threated to ensure her children were removed from her custody.

69. The aforementioned Defendants then showed her the photograph of the man who fled the jewelry store and Cardona stated that the man in the photograph was not the Plaintiff.

70. In response, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, called her "a fucking whore," accusing her of sleeping with Plaintiff, Brown, and Iezzi, and told her to go back to the bench.

71. At some point on November 8, 2010, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, interrogated Plaintiff.

72. According to the activity sheet filled out by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, Plaintiff also identified a picture of Jamal Hicks as "[t]he guy in the store with me."

73. Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, immediately told Plaintiff that they knew that he and Turner murdered Glatz while robbing the jewelry store.

74. Plaintiff responded that he did not even know the crime occurred, and never met or even heard of Turner.

75. Defendant, Former Detective Pitts, began aggressively yelling and spitting in Plaintiff's face in order to intimidate him in full view of and without objection from Defendants, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10,

76. Then, Defendant Former Detective Pitts, in front of the other present Defendants, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, began punching ("doinking") the handcuffed Plaintiff three times in the chest and twice in the shoulders.

77. In order to stop the physical assault, Plaintiff told the Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, what

Plaintiff thought they wanted to hear, and falsely confessed to the crimes the aforementioned Defendants accused Plaintiff of.

78. Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, took Plaintiff over to a computer to identify males from photographs, but Plaintiff did not know them.

79. In response, Defendant, Former Detective Pitts, in full view of and without objection from Defendants, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, grabbed the back of Plaintiff's neck and forced his head in between his legs while screaming at Plaintiff.

80. Once again, out of fear, Plaintiff falsely claimed to know the men in the photographs who the aforementioned Defendants clearly wanted Plaintiff to identify.

81. During the interrogation, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, purposely avoided causing injuries the Plaintiff's face.

82. At the relevant time at the Homicide Unit, Cardona and Iezzi both stated that they could hear Plaintiff speaking with the aforementioned Defendants from the bench and the interrogation rooms.

83. Both Cardona and Iezzi heard the sounds consistent with punches and Plaintiff's screams throughout the night.

84. Iezzi heard Plaintiff scream for, in his words, "what felt like an eternity" and heard Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, say something to the effect of "you did this, this is you."

85. Cardona also stated that she heard Plaintiff pleading with the aforementioned Defendants, asking at least ten (10) times why they were hitting him and to stop hitting him.

86. From the bench, Cardona heard one or more of the Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, say something to the effect of, "stop f'ing around and tell us the truth," and Plaintiff reply with something to the effect of, "yo man I ain't do nothing."

87. One of the Defendants, Detective/Police Officer John Doe 1-10, a white detective, exited the interrogation room and said something to the effect of, "I can't do this anymore. He's like, man, this is not our guy."

88. Defendant Former Detective Pitts exited the room and Cardona asked him why they were hitting Plaintiff, to which he responded with something to the effect of, "shut the fuck up and mind your own business."

89. Plaintiff's interrogation by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, did not end until November 9, 2010, at approximately 1:20 am.

90. Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, documented that they did not take a statement from Plaintiff until 10:55 pm on November 8, 2010, and claimed to have given Plaintiff his Miranda warnings at that time.

91. On the activity sheet dated November 8, 2010, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, wrote, "While at homicide, [Plaintiff] Onyiah waived his Constitutional Rights and gave a statement in which he admitted his role in the robbery/murder of William Glatz."

92. Although Plaintiff was taken into custody at approximately 3:00 pm on November 8, 2010, and was interrogated until approximately 1:20 am on November 9, 2010, Plaintiff's arrest was officially documented on November 10, 2010.

93. On November 10, 2010, two days after Plaintiff was brought to the Homicide Unit, Plaintiff was processed and taken out of the Homicide Unit.

94. The unnecessary delay in processing Plaintiff ensured that any signs of abuse on Plaintiff's dark complexion would have been less likely to be noticed by the city prison medical and intake staff who would likely note any injuries when he was processed.

95. Upon information and belief, Defendants, Police Captain/Lieutenant John Doe 1-5, had knowledge of the conduct of Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, and condoned, acquiesced, or directed the aforementioned Defendants to continue with the unlawful and constitutional conduct.

96. Upon information and belief, Defendants, Police Captain/Lieutenant John Doe 1-5, was personally involved in and played an affirmative part in the misconduct which Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, subjected Plaintiff to.

*Pretrial Suppression Hearing*

97. Plaintiff's criminal defense attorneys filed an omnibus pretrial suppression motion on May 10, 2013, moving to suppress his coerced statement.

98. Before the pretrial suppression hearing, Plaintiff's attorneys failed to advice Plaintiff about his ability to testify at the hearing and failed to call Plaintiff to testify at said hearing.

99. Defendants, Former Detective Pitts and Detective Jenkins, testified that they gave Plaintiff verbal Miranda warnings whilst interviewing him for thirty to forty (30-40) minutes, before giving him "formal" Miranda warnings.

100.     Cardona testified about her interaction with the detectives, including the aforementioned Defendants, including the abuse Plaintiff suffered at the hands of the Defendants, which she heard and witnessed at the police station.

101.     Because the aforementioned Defendants failed to enter Cardona in the police or visitor's log, the court did not believe her testimony that Plaintiff's confession was coerced.

102.     At the suppression hearing, the Commonwealth argued that Cardona was not telling the truth about Defendants' assault and coercive interrogation of Plaintiff since the mugshot did not show any bruising.

103.     Plaintiff has a dark complexion and bruising would not show up in any picture; and, moreover, the mugshot was taken two days after Defendants assaulted Plaintiff.

104.     Plaintiff could not corroborate Cardona's testimony since Plaintiff's attorney did not advise him about the benefits of testifying at the pretrial suppression hearing.

105.     Furthermore, Plaintiff's counsel did not identify or find Iezzi and/or Brown so that he could testify at the suppression hearing or at the trial.

*Plaintiff was Found Guilty at Trial*

106.     Several of the Commonwealth's witnesses provided false or misleading testimony, including, but not limited to:

    a.  Witnesses who claimed Plaintiff fled the scene of the crime.

    b.  During the trial, a witness who did not identify Plaintiff in a single pre-trial lineup or photo array was allowed to identify the Plaintiff in the courtroom.

    c.   The detective who retrieved the jewelry store surveillance video testified that he was unable to determine the heights of the suspects in the video.

    d.   The witness who sent the tip to the detectives in exchange for a reduced sentence, Donell Cheek, refused to testify until the Court threatened to hold him in contempt.

    e.   Defendant, Former Detective Pitts, testified that Plaintiff's sister cooperated in locating Plaintiff; and Defendant, Former Detective Pitts, repeated his false assertions about lawfully interrogating Plaintiff.

    f.   Additionally, Defendant, Former Detective Pitts, falsely claimed that he interrogated another suspect, contrary to his testimony in the pretrial suppression hearing and unsupported by any files/reports from the homicide activity sheets.

107.      On May 31, 2013, the jury convicted Plaintiff of second-degree murder, three counts of robbery, conspiracy to commit a robbery, and a violation of the Uniform Firearms Act.

*New Evidence about Defendants' Pattern of Abuse*

108.      At no point prior to the trial was Plaintiff's criminal defense attorneys made aware of the pattern of behavior that Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, consistently exhibited during interrogations of suspects in the Homicide Unit.

109.      However, On November 6, 2013, the Philadelphia Daily News published an article alleging that Defendants had a pattern of coercing false statements from other individuals for on at least three (3) occasions.

110.      After this article was published, one of Plaintiff's attorneys found additional evidence of the aforementioned Defendants' pattern, practice, and custom of coercing false statements of at least twenty-three (23) separate witnesses or suspects during interrogations by holding them in isolation, usually handcuffed, for prolonged periods of time.

111.      The misconduct perpetrated by Defendant, Former Detective Pitts, including but not limited to the use of excessive force and false arrest, was the subject of six (6) civil lawsuits,

resulting in the City of Philadelphia paying more than $1.8 million to the Plaintiffs in those cases.

112.    Furthermore, at least three statements taken by Defendant, Former Detective Pitts, regarding a criminal matter were suppressed and/or excluded by the Court, and/or rejected by the jury, due to evidence of those statements being false due to Defendant Pitts's coercion.

*Plaintiff was Exonerated in Post-Conviction Proceedings*

113.    On May 9, 2016, after Plaintiff's direct appeals were affirmed, Plaintiff filed a timely *pro se* petition under the Post-Conviction Relief Act (hereinafter "PCRA").

114.    Plaintiff's PCRA petition raised claims of actual innocence, ineffective assistance of trial counsel, and that his confession was coerced due to the aforementioned Defendant Detectives' unlawful use of force during interrogation.

115.    Subsequent amended PCRA filings included a due process violation based on the "pattern and practice" of Defendants, Former Detective Pitts and Detective Jenkins, using coercive and abusive interrogation tactics.

116.    The District Attorney's Office Conviction Integrity Unit investigated Plaintiff's case and filed joint stipulations of fact with Plaintiff.

117.    On May 4, 2021, the Honorable Tracy Brandeis-Roman of the Philadelphia Court of Common Pleas granted the Plaintiff's motion to vacate the conviction and approved the dismissal of all charges against him.

*Evidence of an Official "Blue Code of Silence"*

118.    Not only has Defendant, the City of Philadelphia, failed to take appropriate remedial measures to prevent misconduct of this nature committed by the defendant officers in this case, it has adopted an official policy that helps foster such misconduct.

119.    In January 2009, the Philadelphia Police Department, by and through Defendant, Former

Police Commissioner Charles Ramsey, implemented a written policy that requires supervisors to

remove from all police paperwork the names of all police witnesses who possess exculpatory

information. In pertinent part, that policy states:

> Platoon commanders will be required to review and initial all arrest and
> investigative reports, including PARS reports[1], to ensure that only those
> officers/investigators who are necessary for the successful outcome of the
> case are listed.
>
> (See Memorandum (09-01)(the "Policy"), §III. A. (1), attached as Exhibit "A.")

The meaning of the phrase "successful outcome" is so obvious that it is not defined further. Id.

120.    Pursuant to the Policy, Police supervisors are required to remove from all police paperwork

the names of any Officer(s) that witnessed events, which would be useful to a defendant in a

criminal case, because such officers would not "ensure" a "successful outcome."

121.    In other words, the City of Philadelphia, by and through its Police Department, officially

adopted a written policy to enforce a code of silence or "blue code," which prohibits Officers who

possess exculpatory information from being discovered let alone intervening or providing truthful

information against constitutional violations and other unlawful misconduct committed by their

fellow Officers.

122.    That "successful outcome" means "conviction" is further evinced by the fact that the

Standard Operating Procedures implementing the Memorandum states that "only those officers

necessary for prosecution will be subpoenaed to court." (See Exhibit "B.")

---

[1] As the Court may be aware, the arrest and investigative reports, including PARS reports, are the police
paperwork that is typically provided to an accused in a criminal case. It is this police paperwork that helps an
accused identify, among others, police witnesses.

123.    Defendant, Former Commissioner Charles Ramsey's, implementation of the written policy was issued January 28, 2009, which was before Plaintiff's arrest.

124.    Defendant, Former Commissioner Charles Ramsey's, written policy just memorialized what had been an unofficial policy and/or custom of the Philadelphia Police Department before Plaintiff's arrest.

125.    Defendant Ramsey's written policy ensures exculpatory evidence will not be discovered by the accused and directly promotes *Brady/Gigilio* violations by Philadelphia Police Officers/Detectives, and was the direct and proximate cause of the violation of the Plaintiff's constitutional rights under *Brady/Gigilio* (*see* Count III).

126.    Defendant Ramsey's written policy further causes persons, including the Plaintiff, to be maliciously prosecuted because exculpatory evidence is covered up and/or ignored by Philadelphia Police Officers/Detectives, and they are commanded that only evidence that is "necessary for the successful outcome of the case" should be included in the police paperwork, including investigative and PARS reports, and said written policy was the direct and proximate cause of the violation of the Plaintiff's right to be free from malicious prosecution under the Fourth and Fourteenth Amendments of the Constitution (*see* Count II).

*127.*    Defendant Ramsey's written policy fosters a culture within the PPD of covering up/ignoring exculpatory evidence and securing a successful prosecution at the cost of citizens constitutional rights in violation of *Brady/Gigilio* and is unconstitutional on its face.

## COUNT I
## CONSTITUTIONAL CLAIM- DUE PROCESS
## PLAINTIFF V. FORMER DETECTIVE PITTS, DETECTIVE JENKINS, DETECTIVE LUCKE, AND DETECTIVES/POLICE OFFICERS JOHN DOE 1-10

128.    All preceding paragraphs are incorporated by reference as if more fully set-forth herein.

129.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, acting within the course and scope of their employment, under color of state law, and pursuant to the policies, practices, and customs of the Philadelphia Police Department, Commonwealth of Pennsylvania, and Defendant City of Philadelphia, deprived Plaintiff of his rights, privileges, and immunities under the United States Constitution and the Pennsylvania Constitution.

130.    In particular, the aforementioned Defendants deprived Plaintiff of his Due Process rights pursuant to the Fourteenth Amendment of the U.S. Constitution.

131.    The aforementioned Defendants used threats and physical violence in order to coerce a false statement/confession from Plaintiff and other individuals, using the false statements/confessions in order to convict Plaintiff.

132.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, in their individual capacities, were so malicious, intentional, reckless, and/or recklessly indifferent to Plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands compensatory and punitive damages against Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, jointly and/or severally, under the direction and control of the Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, in

an amount sufficient to fully and adequately compensate Plaintiff, punish Defendants, and deter Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees, and all other appropriate relief.

### COUNT II
### MALICIOUS PROSECUTION- FOURTH AMENDEMENT AND DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT
### PLAINTIFF V. FORMER DETECTIVE PITTS, DETECTIVE JENKINS, DETECTIVE LUCKE, AND/OR DETECTIVES/POLICE OFFICERS JOHN DOE 1-10

133.    All preceding paragraphs are incorporated by reference as if more fully set-forth herein.

134.    Plaintiff's Malicious Prosecution claim is governed by both the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.

135.    Specifically, the time Plaintiff was illegally detained based on a coerced confession prior to his conviction is based on the Fourth Amendment, and the time Plaintiff was illegally incarcerated based on a coerced confession after his conviction is based on the Due Process Clause of the Fourteenth Amendment.

136.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, acting within the course and scope of their employment, under color of state law, and pursuant to the policies, practices, and customs of the Philadelphia Police Department, Commonwealth of Pennsylvania, and Defendant City of Philadelphia, maliciously initiated criminal proceedings against Plaintiff, when they arrested him without probable cause, coerced a confession, and charged him with murder.Defendants initiated criminal proceedings against Plaintiff after the aforementioned Defendants elicited a false confession from Plaintiff and/or false statements.

137.    Defendants materially misrepresented their findings to the Commonwealth on order to initiate a criminal proceeding against Plaintiff.

138.    The proceeding against Plaintiff was initiated without probable cause.

139.    The Commonwealth prosecuting Plaintiff, relying on the coerced confession/statements taken by Defendants, resulted in criminal proceedings ending in a guilty verdict against Plaintiff.

140.    However, after post-conviction relief proceedings, Plaintiff was exonerated and found not guilty of the crimes he was convicted of.

141.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, acted maliciously or for the purpose other than bringing Plaintiff to justice.

142.    Plaintiff suffered a significant depravation of liberty as a consequence of the legal proceeding.

143.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, in their individual capacities, were so malicious, intentional, reckless, and/or recklessly indifferent to Plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands compensatory and punitive damages against Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10,  jointly and/or severally, under the direction and control of the Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, in an amount sufficient to fully and adequately compensate Plaintiff, punish Defendants, and deter

Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees, and all other appropriate relief.

**COUNT III**
**1983 CLAIM - BRADY/GIGILIO**
**PLAINTIFF PLAINTIFF V. FORMER DETECTIVE PITTS, DETECTIVE JENKINS,**
**DETECTIVE LUCKE, AND/OR DETECTIVES/POLICE OFFICERS JOHN DOE 1-10**

144.    All preceding paragraphs are incorporated by reference as if more fully set-forth herein.

145.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, acting within the course and scope of their employment, under color of state law, and pursuant to the policies, practices, and customs of the Philadelphia Police Department and Defendant City of Philadelphia, failed to disclose to Plaintiff's counsel the nature and conditions of Plaintiff's false confession and the false statements made by the Commonwealth's witnesses.

146.    Plaintiff's false confession and the false statements made by the Commonwealth's witnesses unlawfully elicited by the aforementioned Defendants due to coercion were admitted into trial and used to falsely convict Plaintiff.

147.    The aforementioned Defendants, along with City of Philadelphia and the Commonwealth of Pennsylvania, suppressed evidence, willfully or inadvertently, of the pattern of misconduct of Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10.

148.    That withheld evidence was favorable to Plaintiff in order to show that his confession was coerced due to the unlawful actions perpetrated by Defendants, Former

Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10,

149.    That withheld evidence was material to the issues in trial, including, but not limited to, the pretrial suppression hearing regarding Plaintiff's false confession.

150.    There is a reasonable probability that, with the suppressed evidence, Plaintiff would have been found not guilty in the original criminal proceedings.

151.    In fact, this evidence was crucial in overturning Plaintiff's conviction.

152.    Defendants, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, in their individual capacities, were so malicious, intentional, reckless, and/or recklessly indifferent to Plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands compensatory and punitive damages against Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, jointly and/or severally, under the direction and control of the Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, in an amount sufficient to fully and adequately compensate Plaintiff, punish Defendants, and deter Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees, and all other appropriate relief.

**COUNT IV**
**CONSTITUTIONAL CLAIM - BYSTANDER LIABILITY**
**PLAINTIFF V. PLAINTIFF V. FORMER DETECTIVE PITTS, DETECTIVE JENKINS, DETECTIVE LUCKE, AND/OR DETECTIVES/POLICE OFFICERS JOHN DOE 1-10**

153.    All preceding paragraphs are incorporated by reference as if more fully set-forth herein.

154.     Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, have a duty to prevent other Philadelphia Police officers from violating the constitutional rights of Philadelphians.

155.     Specifically, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, have a duty to prevent other Philadelphia Police officers from violating a citizen's Fourth and Fourteenth Amendment rights to be free from malicious prosecution and coerced confessions.

156.     Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, were present when Plaintiff's Fourth and Fourteenth Amendment rights were being violated.

157.     Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, knew or had reason to know that Plaintiff's Fourth and Fourteenth Amendment rights were being violated, and had a realistic opportunity to intervene and prevent the violation of those rights and the resulting harm from occurring.

158.     Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, maliciously, intentionally, recklessly, or with deliberate indifference failed to intervene and halt the unconstitutional conduct of the other defendants, resulting in Plaintiff sustaining injury and harm.

159.     Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, failed to ensure that their Philadelphia Police Department colleagues respected the rights, privileges, and immunities afforded to the People by the Constitution.

160.    In particular, the aforementioned named Defendants failed to ensure that their Philadelphia Police Department colleagues properly interrogated suspects/witnesses, initiated prosecution without malice, and turned over exculpatory evidence to defense attorneys.

161.    Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, in their individual capacities, were so malicious, intentional, reckless, and/or recklessly indifferent to Plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands compensatory and punitive damages against Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, jointly and/or severally, under the direction and control of the Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, in an amount sufficient to fully and adequately compensate Plaintiff, punish Defendants, and deter Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees, and all other appropriate relief.

### COUNT V
### CONSTITUTIONAL CLAIM – CONSPIRACY
### PLAINTIFF V. PLAINTIFF V. FORMER DETECTIVE PITTS, DETECTIVE JENKINS, DETECTIVE LUCKE, AND/OR DETECTIVES/POLICE OFFICERS JOHN DOE 1-10

162.    All preceding paragraphs are incorporated by reference as if more fully set-forth herein.

163.    As demonstrated by their concerted conduct, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, entered into agreement or reached a meeting of the minds to violate Plaintiff's constitutional rights by coercing a false confession from Plaintiff/false statement(s) from other(s), initiate malicious

prosecution against Plaintiff, and withhold exculpatory evidence from Plaintiff and his counsel.

164.    The above-described actions of Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, were so malicious, intentional, reckless, and/or recklessly indifferent to Plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands compensatory and punitive damages against Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, jointly and/or severally, under the direction and control of the Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, in an amount sufficient to fully and adequately compensate Plaintiff, punish Defendants, and deter Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees, and all other appropriate relief.

## COUNT VI
## CONSTITUTIONAL CLAIM - SUPERVISORY LIABILITY
## PLAINTIFF V. POLICE CAPTAIN/LIEUTENANT JOHN DOE 1-5

165.    All preceding paragraphs are incorporated by reference as if more fully set-forth herein.

166.    Plaintiff believes and therefore avers that Defendants, Police Captain/Lieutenant John Doe 1-5, played an affirmative part in the above-described misconduct perpetrated by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, against Plaintiff.

167.    Plaintiff believes and therefore avers that Defendants, Police Captain/Lieutenant John Doe 1-5, were personally involved in the above-described misconduct perpetrated

by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or

Detectives/Police Officers John Doe 1-10, against Plaintiff.

168.     Plaintiff believes and therefore avers that Defendants, Police Captain/Lieutenant

John Doe 1-5, had knowledge of and then acquiesced the above-described misconduct

perpetrated by Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke,

and/or Detectives/Police Officers John Doe 1-10, against Plaintiff.

169.     Defendants, Police Captain/Lieutenant John Doe 1-5, in their supervisory

capacities, were so malicious, intentional, reckless, and/or recklessly indifferent to

Plaintiff's rights and well-being that the imposition of punitive damages is warranted.

**WHEREFORE**, pursuant to 42 U.S.C. § 1983, Plaintiff demands compensatory and punitive

damages against Defendants, Police Captain/Lieutenant John Doe 1-5, jointly and/or severally,

in an amount sufficient to fully and adequately compensate Plaintiff, punish Defendants, and

deter Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees,

and all other appropriate relief.

### COUNT VII
### *MONELL* CLAIM
### PLAINTIFF V. FORMER COMMISSIONER RAMSEY AND THE CITY OF PHILADELPHIA

170.     All preceding paragraphs are incorporated by reference as if more fully set-forth

herein.

171.     Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or

Former Commissioner Charles Ramsey, who exercised final decision-making authority in

all areas relevant to Plaintiff's claims, have adopted and maintained for years a recognized

and accepted policy, practice, and custom of systematically failing to properly train,

investigate, supervise, and/or discipline law enforcement officers in the Homicide Unit, including and especially Defendants, Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, who used unconstitutional methods including, but not limited to, unconstitutional excessive detention without food, water, and/or access to a bathroom; the use of fabricated evidence during interrogations and/or investigations; verbal threats, excessive berating, and/or physical assault when interrogating suspects/witnesses; denial of phone calls to an attorney and/or parents/guardians of a minor; and/or other coercive questioning techniques in order to elicit a false statement/confession. This led law enforcement officers, including and especially Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, to subject individuals to the same treatment suffered by Plaintiff. Said policy, custom, and practice violates the Fifth Amendment as applied to the States through the Fourteenth Amendment of Constitution of the United States, the Laws of the United States, and of the Laws of Commonwealth of Pennsylvania.

172.     Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, have adopted and maintained for years a recognized and accepted policy, practice, and custom of condoning and/or acquiescing to law enforcement officers who use unconstitutional methods when interrogating suspects and/or witnesses; or, in the alternative, failed to train law enforcement officers in the Homicide Unit on the constitutional limits of interrogating suspects and/or witnesses when investigating criminal activity. This led law enforcement officers, including Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers

John Doe 1-10, to subject individuals to the same treatment suffered by Plaintiff. Said policy, custom, and practice violates the Fifth Amendment as applied to the States through the Fourteenth Amendment of Constitution of the United States, the Laws of the United States, and of the Laws of Commonwealth of Pennsylvania.

173.    Plaintiff believes and therefore avers that the failure of Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, to provide adequate training, supervision, investigation of misconduct, and disciplinary actions for misconduct of their law enforcement officers in the Homicide Unit, including and especially Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, regarding the constitutional limits of interrogation tactics, including the unlawful use of force; coercion; and/or verbal threats, resulting in numerous formal and informal complaints being filed against the aforementioned Defendants.

174.    Plaintiff believes and therefore avers that the failure of Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, to adopt adequate policies to prevent and deter law enforcement officers in the Homicide Unit from unlawfully coercing false confessions from suspects, when the need for such policies is obvious, resulted in numerous formal and informal complaints being filed against the aforementioned Defendants.

175.    Plaintiff believes and therefore avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, were aware of the aforementioned policies, practices, and customs for a substantial period of time, and despite that knowledge, failed to take steps to terminate said practices, failed to properly train, investigate, supervise, and/or

discipline Homicide Unit law enforcement officers, including but not limited to Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, for their conduct which violated the Constitution of the United States, the Laws of the United States, and of the Laws of Commonwealth of Pennsylvania.

176.      Plaintiff believes and therefore avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, failed to effectively and properly train, investigate, supervise, and/or discipline Homicide Unit law enforcement officers, including but not limited to Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, with regard to the legal limits on their authority, and instead sanctioned, acquiesced, and/or were deliberately indifferent to the policies, practices, and customs that violated the constitutional rights of individuals such as Plaintiff, as well as the Laws of the United States and of the Laws of Commonwealth of Pennsylvania.

177.      Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, failed to adequately and properly train, investigate, supervise, and/or discipline law enforcement officers who engaged in the above-described unlawful behavior, including and especially Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, when several witnesses and suspects interviewed by the aforementioned Defendants submitted complaints to Internal Affairs.

178.    Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, have been deliberately indifferent to the rights of the citizens of Philadelphia, Pennsylvania, to be free from the unlawful and unconstitutional coercion, verbal threats, physical assault, and other aggressive tactics during investigatory questioning/interrogations by law enforcement officers, including and especially Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10.

179.    Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, have adopted and maintained for years a recognized and accepted policy, practice, and custom of systematically failing to properly train, investigate, supervise, and/or discipline law enforcement officers, including and especially Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, who failed to fulfill their constitutional requirements to turn over exculpatory evidence to the District Attorney's office and to not provide false or coerced statements/confessions to prosecutors. This led law enforcement officers, including the aforementioned named Defendants, to subject individuals to the same treatment suffered by Plaintiff. Said policy, custom, and practice violates the constitutional rights of citizens, the Laws of the United States, and the Laws of the Commonwealth of Pennsylvania.

180.    Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in

all areas relevant to Plaintiff's claims, have adopted and maintained for years a recognized and accepted policy, practice, and custom of condoning and/or acquiescing Homicide Unit law enforcement officers who failed to turn over exculpatory evidence to the District Attorney's Office and to not provide false or coerced statements/confessions to prosecutors. This led law enforcement officers, including and especially Defendants, Detective James Pitts, Detective Ohmarr Jenkins, and/or Defendant John Doe 1-10, to subject individuals to the same treatment suffered by Plaintiff. Said policy, custom, and practice violates the Constitution of the United States, the Laws of the United States, and of the Commonwealth of Pennsylvania.

181.    Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, have adopted and maintained for years a recognized and accepted policy, practice, and custom of systematically failing to investigate claims or complaints made to the Philadelphia Police Department regarding Homicide Unit law enforcement officers' conduct, including and especially the conduct of Defendants, Former Detective Pitts, Detective Jenkins, and/or Defendant John Doe 1-10.

182.    Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, were aware of the aforementioned policies, practices, and customs for a substantial period of time, and despite that knowledge, failed to take steps to terminate said practices; properly supervise, train, and/or discipline law enforcement officers, including and especially the named Defendants; and instead

sanctioned, acquiesced, and/or were deliberately indifferent to the policies, practices, and customs that violate the constitutional rights of individuals such as Plaintiff.

183.    Plaintiff believes and therefor avers that Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, who exercised final decision-making authority in all areas relevant to Plaintiff's claims, knew or should have known about the aforementioned policies, practices, and customs of the Philadelphia Police Department and deliberately, intentionally, and knowingly failed to take steps to terminate or limit said policies, practices, and customs, including, but now limited to, the following:

   a. Failure to train members of the Philadelphia Police Department's Homicide Unit on the constitutional limits of search, seizure, and custodial interrogation;

   b. Failure to investigate claims of misconduct perpetrated by law enforcement officers in the Homicide Unit;

   c. Failure to have clear and appropriate guidelines on custodial interrogations and/or questioning witnesses during homicide investigations;

   d. Failure to properly supervise and/or control law enforcement officers in the Homicide Unit who conduct custodial interrogations and/or question witnesses;

   e. Failure to discipline law enforcement officers in the Homicide Unit who use unlawful and coercive techniques during custodial interrogations and/or questioning witnesses;

   f. Failure to conduct systematic and complete Internal Affairs investigations on reports of law enforcement officers, especially those in the Homicide Unit, who are accused of using unlawful and coercive techniques during custodial interrogations and/or questioning witnesses;

   g. Failure to train members of the Philadelphia Police Department's Homicide Unit on their constitutional duty to turn over exculpatory evidence to the District Attorney's Office;

   h. Failure to investigate claims of law enforcement officers in the Homicide Unit turning over fabricated/false confessions/statements and discipline those officers; and

    i.   Failure to have clear and appropriate guidelines on which evidence to turn over to the District Attorney's Office;

184.      The Philadelphia Police Department and/or its Homicide Unit, including and specifically the individually named Defendants, have a history of using threats and physical assault in order to coerce witnesses into making false statements. Reports made to superior officers and to Internal Affairs were systematically and unconstitutionally ignored. This led to circumstances similar to the instant matter. A non-exhaustive list of constitutional violations committed by Defendant Former Detective Pitts includes, but is not limited to, the following[2]:

    a.   On March 3, 2022, Defendant Former Detective Pitts was arrested and charged with perjury in Plaintiff's criminal investigation and trial.

    b.   The City of Philadelphia settled a lawsuit filed by a witness who was interviewed by Defendant, Former Detective Pitts, and another detective in 2013. During the thirty (30) hour-long interview, Defendant Pitts verbally berated her when she could not provide an account of the shooting. As a result, the women began having chest pains, and was taken out of the Homicide Unit in a stretcher and to the hospital.

    c.   A man filed an Internal Affairs complaint against detectives, including Defendant Former Detective Pitts, because of their misconduct during a 2013 interrogation. The man stated Defendant Pitts assaulted him by punching his jaw and pressing against his genitalia.

    d.   The City of Philadelphia settled a lawsuit arising out of a homicide investigation conducted by Defendant Former Detective Pitts in 2013. Defendant Pitts threatened the victim's family, detaining the victim's fifty-three (53) year old uncle for sixteen (16) hours without food, water, or access to a bathroom. During this time, Defendant Pitts illegally searched the man's phone and assaulted the man by throwing him onto the ground and striking him in the head.

    e.   A woman filed an Internal Affairs complaint against detectives, including Defendant Former Detective Pitts, as a result of their questioning her in 2013 related to a homicide investigation. The detectives, including Defendant Pitts, held her in the Homicide Unit for three (3) days without any food or water except a soft pretzel and a soda. She was not allowed to contact anyone to arrange

---

[2] All these instances of misconduct can be found in "The Homicide Files," a special report by The Philadelphia Inquirer, with the relevant filings, Internal Affairs investigations, and testimony.

accommodation for her child, including childcare, and the detectives threatened to take her child away if she did not cooperate. Internal Affairs sustained her story after the investigation.

f.  During an investigation of a 2013 homicide, a witness recanted her statement made to Defendant Former Detective Pitts. At a preliminary hearing, the witness claimed Defendant Pitts coerced a false statement by threatening to take her children away. The accused was acquitted as a result.

g.  In 2012, a, eighty-four (84) year-old man filed an Internal Affairs complaint against Defendant Former Detective Pitts. The elderly man stated Defendant Pitts unlawfully entered his home looking for his grandson. While inside the man's home, Defendant Pitts threatened him with arrest and assaulted him by striking him in the chest and throwing him against the wall. Then, Defendant Pitts placed the man in handcuffs and left him in the Police Administration Building for hours. Internal Affairs found that Defendant Pitts abused his authority and damaged the man's property.

h.  Charges were dismissed during a criminal trial against a man who, in 2012, was accused of vehicular homicide. The man won a lawsuit against detectives, including Defendant Former Detective Pitts, for concealing exculpatory evidence from both the medical examiner and the District Attorney's Office and making false statements.

i.  A family of victim of a police shooting won a civil lawsuit against the City of Philadelphia because of the conduct of detectives, including Defendant Former Detective Pitts, during the 2011 investigation. The victim's sister stated the detectives, including Defendant Pitts, threatened to arrest her and take her child away if she did not sign a statement falsely justifying the officer's use of force. The victim's sister stated that Defendant Pitts and the other detectives left her for hours without food or water, and would not let her speak to her mother.

j.  Detectives, including Defendant Former Detective Pitts, took several statements from witnesses in 2011 who claimed they were mistreated. One witness who recanted his statement at trial and testified Defendant Pitts and another detective detained him without water for twelve (12) hours, and that the second detective struck him. Another witness testified that Defendant Pitts and the second detective coerced a false statement when that witness was intoxicated.

k.  During a 2011 homicide investigation, detectives, including Defendant Former Detective Pitts, coerced two eyewitnesses into making false statements implicating a suspect. At trial one of the witnesses testified that he was held for eighteen (18) hours, where Defendant Pitts assaulted and threatened him, including choking him and saying that they would charge him with the homicide, until the witness signed the false statement.

l.  A woman, interrogated by Defendant Former Detective Pitts and another detective, stated that the detectives brought her directly from the hospital to the Homicide Unit. Detectives, including Defendant Pitts, kept her in a freezing cold room, denied her access to a bathroom, verbally berated her, and threatened to take her children away if she did not sign a statement confessing to homicide. Her conviction was later reversed, and she pleaded to lesser charges in a subsequent trial.

m.  Two women, interviewed by Defendant Former Detective Pitts as witnesses to a 2011 homicide, testified in court that the aforementioned Defendant coerced false statements by threatening them with incarceration if they did not implicate the suspect. One of the witnesses also testified that Defendant Pitts continued to harass and intimidate her throughout the court proceedings, even striking her.

n.  In 2010, an Internal Review complaint was filed by a suspect against Defendant, Former Detective Pitts, stating that during the interrogation, Defendant Pitts handcuffed him and began punching and kicking the suspect until he was barely conscious. The detectives took the suspect to the hospital and returned him to the interrogation room, where Defendant Pitts denied his requests for an attorney and continued to strike the suspect.

o.  A witness testified at trial that Defendant, Former Detective Pitts, threatened to take her children away if she did not sign a false statement implicating the defendant in a 2010 homicide

p.  A minor, who was sixteen (16) years-old, testified that detectives, including Defendant Former Detective Pitts, coerced him to sign a false statement which implicated his cousin for murder in 2009. The minor, who also had a learning disability, was interrogated for about six (6) hours without the presence of a parent or guardian. During the interrogation, Defendant Former Detective Pitts physically assaulted him and threatened the minor with incarceration and an escalation of physical force. The minor repeatedly asked to call his aunt, but Defendant Former Detective Pitts denied his request. The minor's cousin was acquitted of all charges.

q.  Detectives, including Defendant Former Detective Pitts, coerced a woman into falsely confessing to the murder of her roommate after a forty-one (41) hour interrogation in 2009. The woman testified that Defendant Former Detective Pitts threatened her, physically assaulted her by striking her face with rolled-up papers and left her handcuffed in a chair over the course of several hours. He then typed up a false confession and coerced the woman to sign. As a result, the woman's involuntary confession was suppressed, and Judge Teresa Sarmina dropped the charges against the woman.

r.  A man filed a complaint with Internal Affairs as a result of his interrogation in 2009 against detectives, including Defendant Former Detective Pitts, who partook in an "abusive tag team" to coerce a false confession. Defendant Former Detective Pitts and his partner kept the man at the Homicide Unit for about 36 hours, denying his

request for an attorney. After the man was given his Miranda Rights by the aforementioned detectives, he checked that he wanted an attorney. Defendant Former Detective Pitts tore up the paper, threatening to sabotage his mother's business and have her house taken if he requested an attorney on the paper Miranda Rights form. The man's mother filed an affidavit stating Defendant Former Detective Pitts gave her the same threats to coerce her into "cooperating."

s.  In 2009, Detectives, including Defendant Former Detective Pitts, interviewed three witnesses in connection with a homicide and all three recanted their statements, stating that detectives coerced them into making false statements. One witness was nineteen (19) years old, and the other two witnesses were minors. The nineteen-year-old witness stated that he was held for two days and detectives, including Defendant Former Detective Pitts, physically assaulted him until he signed a false statement. One of the teenage witnesses stated that he signed the false statement given to him by detectives after he was detained for twenty (20) hours without food, was not allowed to make a phone call, handcuffed to the table, and was told by detectives that he would be charged with the murder unless he signed the statement. The second minor, the accused's fifteen (15) year-old brother, claimed that detective threatened to charge him and/or his mother of the murder unless he signed a statement. This witness stated he was illiterate and did not know the statement implicated his brother. The Superior Court upheld the conviction because the jury heard testimony from the three witnesses about the misconduct perpetrated by detectives, including Defendant Former Detective Pitts, and found the accused guilty regardless.

t.  Detectives, including Defendant Former Detective Pitts, while investigating a 2008 homicide, coerced two witnesses to sign statements they knew were false. The girlfriend of one of the accused submitted an initial tip to detectives because she was angry with her boyfriend; but was in reality, she was with her boyfriend on the night the homicide occurred. The girlfriend stated she was under the influence of narcotics while being interviewed by detectives and was handcuffed to a chair, locked in the interview room for several hours without food, and was threatened to take her child away and file charges against her for the homicide is she did not sign a statement. The detectives would not allow her to read the statement before she signed it. The accused's neighbor was interviewed by detectives, including Defendant Former Detective Pitts, who told him he would be incarcerated if he did not sign a statement. The neighbor stated he was illiterate and did not know what the statement said when he signed it.

u.  In 2008, homicide detectives, including Defendant Former Detective Pitts, interrogated a minor for seventy-two (72) hours without his parent present nor parental permission, and several witnesses recanted their statements due to the detectives' misconduct. The minor, who was fifteen (15) years-old at the time, asked to speak with his mother, but a detective falsely stated that he has spoken with her, and she said he "should do the right thing." Defendant Former Detective Pitts coerced the minor to sign a statement implicating his cousin in a murder by

falsely stating his cousin had confessed that it was the minor who committed the murder, and moreover, saying that the minor would never see his young daughter again if he did not sign the statement. Over the course of the seventy-two (72) hour detention, detectives only allowed the minor to use the bathroom once. Another person signed a memorandum of agreement with the District Attorney's Office stating he saw the accused commit the homicide in exchange for a reduced sentence, but ultimately recanted his statement at trial. That person stated detectives, including Defendant Former Detective Pitts, threatened to charge him with the murder unless he complied, and left him handcuffed to the interrogation room table for over eight (8) hours. Another witness recanted his statement at trial and claimed Defendant Former Detective Pitts threatened to retaliate with getting him removed from a drug treatment program, and that he was illiterate and could not read the statement that he signed. A fourth witness also recanted his statement at trial.

v.  While investigating another 2008 homicide, detectives, including Defendant Former Detective Pitts, coerced a seventeen (17) year-old minor into signing a statement implicating himself and a classmate during a homicide investigation. During the interrogation, Defendant Former Detective Pitts slapped the minor in the face, left the minor handcuffed in a chair, and forced the minor to sign a falsified statement which the aforementioned Defendant had written. The minor was illiterate, only having a fourth grade reading level, and did not understand the contents of the statement before signing. The minor was questioned without a parent present.

w.  During a preliminary hearing, a witness recanted a statement he made to homicide detectives in 2008, testifying that Defendant Former Detective Pitts, with the help of other detectives in the Homicide Unit, interrogated him for about eight (8) hours, harassed him, called his friend's mother in an attempt to coerce a false statement, and physically assaulted him. Moreover, Defendant Former Detective Pitts struck the witness with such great force that his head slammed on the table, knocking him unconscious. When the witness regained consciousness, detectives, Defendant Former Detective Pitts, gave him a false statement to sign.

x.  A man accused and convicted of a homicide in 2008 was exonerated because the statement from the Commonwealth's key witness was fabricated by detectives, including Defendant Former Detective Pitts. The witness stated that Defendant Former Detective Pitts interrogated him all day while physically assaulting him, telling him that his children would be taken away, and threatening to charge him for the homicide unless he signed a fabricated statement. The witness's girlfriend, who was not called as a witness for the Commonwealth, stated that she received similar threats during the interrogation by detectives, including Defendant Former Detective Pitts. Judge Teresa Sarmina, who overturned the conviction, recognized that Defendant Former Detective Pitts "continuously and systematically" used abusive tactics to coerce false statements and confessions from witnesses and suspects.

y.  A witness falsely implicated a suspect in a 2008 homicide case after detectives, including Defendant Former Detective Pitts, interrogated him for thirteen (13) hours. Before the interrogation, the witness informed detectives that he was intoxicated, at which point the detectives gave him a shot of liquor. After the witness told the detectives he was not present at the time when the homicide was committed, the detectives handcuffed him and brought in to be questioned by another pair of detectives, including Defendant Former Detective Pitts. The aforementioned Defendant grabbed the witness roughly, slammed him against the wall and struck his head, all while threatening to arrest him for murder and have his elderly sister arrested for harboring a fugitive. The second detective, in the presence of Defendant Former Detective Pitts, choked the witness.

A second witness, who was deaf, claimed that detectives, including Defendant Former Detective Pitts, fabricated parts of his statement and did not provide him with a sign language interpreter. The second witness also stated that Defendant Former Detective Pitts also threatened and physically assaulted him, grabbing him, and slamming his head into the wall.

z.  In 2007, an eyewitness to the shooting testified that police and/or detectives, including Defendant Former Detective Pitts, coerced her into testifying at a preliminary hearing by detaining the eyewitness's daughter. Police informed the eyewitness that they were actually looking for her, and she could lose custody of her children if she did not appear at the preliminary hearing. The codefendant, who was the other codefendant's sister, testified at trial that detectives, including Defendant Former Detective Pitts, physically assaulted her while making threats including charging her as the sole shooter and having her children taken away, if she did not sign a false statement implicating herself and her brother.

aa.  While investigating a murder in 2007, detectives, including Defendant Former Detective Pitts, coerced several witnessed and suspects to make false and/or incriminating statements though the use of threats, physical assault, and mistreatment. As a result of the misconduct of detectives, including Defendant Former Detective Pitts, during this case, two witnesses testified in court about the egregious misconduct; Internal Affairs investigated the detectives' actions; a witness submitted a sworn affidavit describing Defendant Former Detective Pitts's physical and sexual abuse; and the court held an evidentiary hearing after the convictions.

One witness, who was ultimately charged in connection with the shooting, filed a complaint with Internal Affairs where he stated Defendant Former Detective Pitts brought him into the Homicide Unit straight from the hospital, where he was being treated for a gunshot wound to the abdomen. According to the witness, Defendant Former Detective Pitts held him for nine (9) or ten (10) hours, allowing his pain medication to wear off before interviewing him. Another detective played "bumper chairs" with the witness's wheelchair while he was at the Homicide Unit. The

witness, who was in great pain and discomfort, claimed that during the interview Defendant Former Detective Pitts cursed at him, threatening to have the witness incarcerated for life. Other detectives present did nothing to stop the misconduct of Defendant Former Detective Pitts and others.

Another witness in this case submitted an affidavit stating Defendant Former Detective Pitts told her she would not be arrested and put in jail if she signed a false statement he provided. The witness also claimed that after that interview. Defendant Former Detective Pitts maintained a five (5) year sexual relationship with her, which he called "witness protection." The aforementioned Defendant would provide the witness hotel accommodations, marijuana, alcohol, and cash in exchange for sexual relations several nights a week. In her testimony, the witness also stated Defendant Former Detective Pitts abused her physically by choking her and striking her face, leaving her with bruises around her eye.

Another witness in that case testified in court that while being interviewed, detectives, including Defendant Former Detective Pitts, held her for three days in the Homicide Unit, denying her food and water. She testified that Defendant Former Detective Pitts threatened her with life in prison, taking her children away, and ensuring she lost her public housing assistance. Additionally, this witness testified that Defendant Former Detective Pitts, with other detectives, harassed her and her cousin before the trial to ensure that they would not testify. The detectives' misconduct included breaking down the witness's door "with a fake warrant," showing up to her children's school to ask questions and interfering with her employment to the point where she was almost terminated. Additionally, the witness testified that the detectives put her picture in the newspaper, stated she was wanted for questioning, and in the police station.

A suspect who was charged with the murder filed an Internal Affairs complaint against the detectives, including Defendant Former Detective Pitts, who interviewed him in connection with the case. The suspect suffered a gunshot wound to the abdomen and stated that he was an innocent victim. During the interview, when the suspect was bound to a wheelchair due to his injuries and handcuffed to the interrogation table, Defendant Former Detective Pitts struck the suspect in the head with a telephone book; struck the suspect in the abdomen near his gunshot wound, causing the suspect's staples to rip and him to bleed again; and told him something to the effect of "I will let you die before you see medical." Defendant Former Detective Pitts later grabbed the suspect by the throat while striking him in the head and threatened to have another witness charged for homicide and have her children taken if he did not confess. The suspect also stated that Defendant Former Detective Pitts forged his signature to sign a false statement that was drafted by another detective.

bb. A suspect filed a complaint with Internal Affairs against detectives, including Defendant Former Detective Pitts, as a result of a 2007 interrogation. The suspect stated that Defendant Former Detective Pitts physically assaulted him during the

interrogation, striking him on the side and the back *but never in the face*, and telling him something to the effect of "you're going to spend the rest of your life in jail." In his complaint, the suspect stated that other detectives were aware of Defendant Former Detective Pitts' conduct but did nothing to intervene.

cc. In 2006, during the investigation of a shooting resulting in murder, an accused man was wrongfully implicated by a minor who was interrogated by Philadelphia detectives. The minor alleged that detectives, including Defendant Former Detective Pitts, shoved his head onto the table; left him handcuffed in a dark for hours; and coerced him to sign a fabricated confession, which he did not realize until after his attorney received discovery. Detectives, including Defendant Former Detective Pitts, left one of the victims of the shooting handcuffed to a bench for hours before interrogating him. The victim, who had just arrived from the hospital for treatment of a gunshot wound to the legs and buttocks and was still in a hospital gown during the interrogation, was denied use of the bathroom and was struck on his gunshot wound by aforementioned Defendant and/or other detectives. Defendant Former Detective Pitts and other detectives fabricated the victim's statement implicating the accused. Furthermore, an eyewitness to the shooting, who knew the accused was not the shooter, tried to testify in court but was threatened by Defendant Former Detective Pitts at the courthouse. The accused was tried four times with the results as follows—a mistrial, a guilty verdict which was overturned, a hung jury, and, finally, and acquittal. The accused was exonerated after spending thirteen (13) in prison.

dd. In 2001, while investigating a homicide, detectives interviewed a 12-year-old minor who witnessed the crime. However, the minor's father specifically told the detectives, including Defendant Former Detective Pitts, that he did not want them to interview his son. The detectives coerced a false statement from the minor, who was the only eyewitness who signed a statement placing the accused at the scene as the shooter.

185.    A non-exhaustive list of constitutional violations committed by Defendant Detective Jenkins includes, but is not limited to, the following:

a. During the investigation of a 2011 homicide, detectives, including Defendant Detective Jenkins, coerced witnesses into making false statements and making false identifications. At the preliminary hearing, one witness testified that Defendant Jenkins and another detective told him he could not go home until he signed a statement and choose the accused out of the photo array. The witness also testified that detectives picked him up and held him in the Homicide Unit a day prior to appearing in court.

b. A witness, a teenage minor, testified at a preliminary hearing that Defendant Detective Jenkins and another detective took him from juvenile court and transported him to the Homicide Unit in handcuffs to conduct an interview in 2011.

The minor witness states that the aforementioned Defendant and other detectives kept in in a room for eight to nine (8-9) hours before coercing a false statement.

c.   The City of Philadelphia settled a lawsuit filed by a wrongfully-convicted teenager due to detectives, including Defendant Detective Jenkins, coercing witnesses into making false statements. The teenager's conviction was overturned and he was acquitted.

186.   A non-exhaustive list of constitutional violations committed by both Defendants,

Former Detective Pitts and Detective Jenkins includes, but is not limited to, the following:

a.   In 2010, during the investigation of a murder, Defendants Former Detective Pitts and Detective Jenkins coerced a seventeen (17) year-old minor into signing a false confession, telling her she could return home after signing the paper.

b.   In a civil suit filed against Defendants Former Detective Pitts and Detective Jenkins, a man stated that in 2010, the aforementioned Defendant-detectives detained him in the Homicide Unit for three days where he was denied access to an attorney, kicked, and beaten, resulting in a broken finger. The Defendants threatened to charge him with homicide if he failed to implicate a different suspect.

c.   A sixteen (16) year-old minor filed a complaint with Internal Affairs against Defendant, Former Detective Pitts, for his conduct during an interrogation in 2009. After detaining the minor at his high school, Defendant, Former Detective Pitts, punched the minor in the stomach and placed handcuffs too tightly to cause great discomfort before transporting him to the homicide unit. Detectives, including Defendant Pitts, proceeded to interrogate the minor suspect without parental presence or consent.

During the investigation, Defendants, Former Detective Pitts and Detective Jenkins, detained a witness, who was twelve (12) year-old minor, in handcuffs and denied her request to contact her mother. The minor stated that the aforementioned Defendants typed up a false statement and coerced her to sign with threats of arresting her. Detectives, including Defendants, detained her before the trial to ensure she cooperated.

At trial, two witnesses interviewed by Defendant, Former Detective Pitts, recanted their statements.

d.   In 2009, detectives, including Defendant Former Detective Pitts, interrogated a sixteen (16) year-old suspect without parental supervision nor consent, leading the suspect to file a complaint with Internal Affairs. During the interrogation, Defendant Former Detective Pitts kept the minor suspect handcuffed tightly; physically assaulted the restrained minor suspect by punching him in the stomach and kicking his chair; and called him a liar. Defendants, Defendant Former

Detective Pitts and Detective Jenkins, interviewed a twelve (12) year-old minor who witnessed the homicide. The aforementioned Defendants brought the minor to the Homicide Units in handcuffs and refused her request to call her mother.

e.   In 2009, several people accused of and witnesses to a double homicide claimed that detectives, including Defendants Former Detective Pitts and Detective Jenkins, used abusive interrogation tactics in order to coerce false confessions/statements from them. One of the accused, who did not sign a confession, stated that Defendants, Former Detective Pitts and Detective Jenkins, kept interrogating him over the course of three (3) days; denied his request to speak with an attorney; and threatened him with life in prison. Furthermore, the accused stated he was physically assaulted by Defendant Former Detective Pitts, who struck him in the face.

f.   While investigating a 2009 homicide, detectives, including Defendants Former Detective Pitts and Detective Jenkins, coerced a statement from one of the accused's girlfriend. The girlfriend testified that Defendant Former Detective Pitts arrived at her son's daycare facility, confronted her, and placed her in handcuffs to escort her to the Homicide Unit for interrogation. The detectives, including the aforementioned Defendants, detained her in the Homicide Unit for two (2) days. Detective Pitts handcuffed her to a chair, grabbed her forcefully, and threatened her by saying her name would go on a warrant unless she signed a statement the aforementioned Defendants drafted, despite the witness giving three statements over the course of her detainment.

g.   Defendant City of Philadelphia settled a lawsuit filed by a man who falsely confessed to a murder in 2008 as a direct and proximate result of abusive coercion tactics used by Defendants, Former Detective Pitts and Detective Jenkins. During the investigation of a homicide, Defendants Former Detective Pitts and Detective Jenkins interrogated the innocent man for twenty-four (24) hours, during which the aforementioned Defendants used sleep deprivation, physical assaults, and other means of intimidation and threats to coerce a false confession. As a result, the man remained in jail for four (4) years awaiting trial. The man recanted his confession and was acquitted.

187.    In 2007, Philadelphia detectives, including Defendants Former Detective Pitts and Detective Jenkins, coerced a suspect of a crime to implicate two men for a previous crime of which he was a victim of. During his testimony at trial, Defendant Detective Jenkins stated that physical and forensic evidence, including the bullet casings and ballistic reports, were unable to be presented to the court because they were lost. After the trial, the suspect submitted an affidavit to the court, stating that while being interrogated by the

aforementioned Defendants, Defendant Former Detective Pitts gave him information to implicate two men in the previous crime and offered him a reduced sentence in exchange. The suspect, who was unable to identify his assailants originally because their faces were behind masks, identified the men during his interrogation from the same photo array he was shown originally. A witness to the crime also submitted an affidavit to the court which stated the assailants could not have been identified by a photo array because they wore masks to obscure their face. Based on the lengthy list of complaints against Former Detective Pitts and Detective Jenkins regarding conduct similar to that alleged in Plaintiff's Amended Complaint, Defendants City of Philadelphia and/or Former Commissioner Charles Ramsey failed to adequately investigate the complaints against Pitts and Jenkins and failed to adequately discipline Pitts and Jenkins for their unconstitutional conduct, which was the direct and proximate cause of their violaton of the Plaintiff's constitutional rights.

188.    Based on the lengthy list of complaints against Former Detective Pitts and Detective Jenkins regarding conduct similar to that alleged in Plaintiff's Amended Complaint, the need to have policies and training regarding the use of physical and psychological coercion during the interrogation of criminal suspects is obvious, and Defendants City of Philadelphia and/or Former Commissioner Charles Ramsey were deliberately indifferent to the Plaintiff's constitutional rights by failing to have the needed policies and training.

189.    The failures of Defendants, City of Philadelphia and/or Former Commissioner Charles Ramsey, to limit or terminate the aforementioned policies, practices, and customs, and/or deliberate indifference to said policies, practices, and customs, including and

especially the actions of Defendants, Former Detective Pitts, Detective Jenkins, Detective Lucke, and/or Detectives/Police Officers John Doe 1-10, were the proximate cause of the Plaintiff's injuries and losses in addition to the violation of Plaintiff's constitutional rights.

190.      Defendants City of Philadelphia and/or Former Commissioner Charles Ramsey had an unconstitutional written policy that encouraged and commanded PPD Officers and Detectives to cover up and ignore exculpatory evidence and to secure a successful prosecution at the cost of a citizen's constitutional rights in violation of *Brady/Gigilio*, and this unconstitutional written policy was the direct and proximate cause of the violation of the   Plaintiff's rights under *Brady/Gigilio* and his right to be free from malicious prosecution under the Fourth and Fourteenth Amendment of the Constitution.

**WHEREFORE**, Plaintiff demands compensatory and punitive damages against all Defendants jointly and/or severally, in an amount sufficient to compensate Plaintiff, punish Defendants, and deter Defendants and others similarly situated to Defendants, plus interest, costs, attorney's fees, and all other appropriate relief fully and adequately. Plaintiff hereby demands a jury trial as to all claims asserted.

　　　 /s/ Teri B. Himebaugh
Teri M. Himebaugh, Esquire
PA ID No. 53603
thimebaughesq@earthlink.net

Law Offices of Teri D. Himebaugh, J.D. LIM
1400 Spring Garden Street, Suite 911
Philadelphia, PA  19130
484.686.3279
*Counsel for Plaintiff*

　　　 /s/ Alan E. Denenberg
Alan E. Denenberg, Esquire
PA ID No. 54161

adenenber@adlawfirm.com

Abramson and Denenberg, P.C.
1315 Walnut Street, Suite 500
Philadelphia, PA  19107
215.546.1345
*Counsel for Plaintiff*



## PHILADELPHIA POLICE DEPARTMENT

**MEMORANDUM (09-01)**                                       **(01-28-09)**

**SUBJECT:  OVERTIME MANAGEMENT**

---

### I.   POLICY

    A. Managing overtime costs are an essential element of supervisory and management responsibilities.  The underlying goal of these procedures is to use overtime only when necessary; not to impede legitimate policing and investigative work. The following measures for all personnel in the Philadelphia Police Department (PPD) shall be implemented immediately.  The purpose of these Department-wide procedures is to achieve uniformity in performance of our public service mission and to provide consistency in determining the need, use, distribution and management of overtime usage and in accordance with Directive 99 – "Overtime Pay and Compensatory Time" and Directive 13 – "Court Notices and Subpoenas."

---

### II.   PROCEDURES FOR NON-COURT OVERTIME

    A. Following the end of each pay period, the Administrative Service Bureau shall provide an overtime monitoring report to each unit detailing the use of overtime by type.  A department summary will be provided to the Police Commissioner.

    B. The responsibilities set forth below outline general guidelines and procedures applicable to all police personnel receiving non-court overtime compensation, including but not limited to arrest, investigative and administrative overtime. These guidelines and procedures do not pertain to overtime used for special events or federally-funded task forces, unless otherwise ordered.

    C. Staffing should be planned so that most cases require only essential overtime.  When significant and recurring overtime is required, other alternatives should be considered such as redistribution of workload, postponement of the work, or the use of temporary help.  Overtime pay should not be used as a means to provide supplemental pay to an employee.

    D. Personnel members on less than full-duty status are not normally eligible for non-court overtime compensation. Exceptions may be requested through the chain of command for approval by the Deputy Commissioner for Organizational Support Services.

- 1 -



E. Commanders/Managers shall be responsible for approving non-court overtime for employees within their respective unit, division or bureau. Approval may only be delegated in the manner listed below.

   1. The Commanding Officer/Manager may give discretion to Platoon Commanders to approve discretionary overtime for two (2) hours.

   2. The Commanding Officer must approve all overtime greater than two (2) hours and up to six (6) hours.

   3. The Divisional Commanders (Inspector) must approve all discretionary overtime greater than six (6) hours.

F. Commanders/Managers shall approve all overtime assignments prior to overtime being worked by police personnel. Advance authorization is required for overtime usage, unless exigent public safety and/or emergency conditions exist which necessitate approval after overtime usage has occurred.

G. The Request to Work Non-Court Overtime Form (75-57) shall be available to all employees within each unit, and be completed by the employee working overtime.

   1. Upon written approval (signature) by the respective Commanders, or designee as outlined above, for each unit, the Request to Work Non-Court Overtime Form (75-57) shall be attached to the Daily Attendance Record (DAR).

   2. Commanding Officers will collect, maintain and store all Overtime Authorization Forms in a manner consistent with the retention of the DARs as defined in Directive 115 – "Records Retention and Disposition Protocol."

H. Commanders/Managers shall be provided with a report at the end of each pay period for the purposes of monitoring and reviewing the use of overtime. Corrective action shall be taken as appropriate to ensure the appropriate use of overtime. This is an essential managerial task, and must be done in conjunction with the approval process for all employees within each respective unit.

---

## III. PROCEDURES FOR COURT OVERTIME

A. Commanders/Managers shall also be responsible for reviewing and monitoring all court overtime for all employees in their respective units.

   1. Platoon commanders will be required to review and initial all arrest and investigative reports, including PARS reports, to ensure that only those officers/investigators who are necessary for the successful outcome of the case are listed.

B. This department-wide procedure sets the minimum requirements that all members must follow. Since the functions and responsibilities vary within each unit of the Philadelphia Police Department, bureaus may establish additional standard operating procedures (SOP). Such procedures shall not override the requirements stated here. All such SOPs shall be forwarded to the newly created Division of Standards and Accountability.

C. Unit commanders shall be responsible for the following:

    1. Approving overtime requests in accordance with the procedures outlined in this memorandum.

    2. Tracking the use of overtime by assigned personnel.

    3. Reviewing and monitoring all overtime usage for their respective unit on a monthly basis.

D. The Division of Standards and Accountability, under the Office of Operational Coordination and Accountability shall be charged with the following:

    1. Monitoring, analyzing and ensuring compliance with appropriate overtime usage protocols.

    2. Reviewing all unit-generated procedures on overtime management and providing corrective feedback to ensure compliance with this document.

    3. Identifying, analyzing and determining the appropriateness of individuals earning large amounts of overtime.

    4. Attend monthly COMPSTAT sessions for issues concerning overtime usage.

E. Overtime abuses or failures to comply with the above standard operating procedures shall be subject to disciplinary action.

---

**CHARLES H. RAMSEY**
Commissioner

---

| FOOTNOTE # | GENERAL # | DATE SENT | REVISION |
|---|---|---|---|
| *1 | 5671 (bt) 5672 (al) | 01-30-09 | Phone Number Change |

    2. All reports should clearly articulate the facts and circumstances of each case. Platoon commanders are responsible for ensuring that reports comprehensively capture the exact actions relevant to that case for each personnel member listed, including the supervisor.

B. Supervisors shall ensure that they are directing an investigation appropriately and not placing themselves in a position that will require their testimony at a later date. A supervisor shall, upon receipt of any court notices requesting his/her presence, make this court notice known to his/her Commanding Officer.

C. Assigned investigative supervisors maintain the overall responsibility for case management, including the number of police personnel involved in each case. When feasible, the lead investigator, or co-investigator, will assume responsibility for handing multiple components of each case, including collecting physical evidence, writing property receipts, taking statements, and assuming the role of affiant on the search or arrest warrant. The narrative description included on all search or arrest warrants should match these assigned roles and responsibilities.

D. All court notices, especially Preliminary Hearings, will be reviewed by platoon supervisors to determine whether the subpoenaed member is necessary. Attention should also be paid to the number of personnel subpoenaed for a particular case as well as the number of consecutive days personnel are required to attend the same case.

    1. Whenever there appears to be unnecessary personnel requested on a case, the supervisor will contact the Overtime Management Unit (215-685-3674 or 75) to refer the case for their review.

    2. Whenever there are six (6) or more personnel subpoenaed on the same case, the supervisor will contact the Overtime Management Unit to refer the case for their review.

E. When police personnel are subpoenaed for court on a Scheduled Day Off (SDO), the platoon supervisor shall initiate an immediate review of the case and arrest paperwork to determine the need for the officer's appearance. If it appears that the officer is unnecessary, the supervisor shall contact the Overtime Management Unit to refer the case for their review.

---

## IV. COMPLIANCE

A. All personnel who receive overtime compensation shall participate in managing usage in a manner that is consistent with the procedures outlined in this memorandum. Accountability for overtime usage rests with every individual member of the Department.

Philadelphia Police Department
*Standard Operating Procedure*
Overtime Management & Reduction

I. **SCOPE**

  A. The following measures for Field Operations Bureau Personnel shall be implemented immediately in order to meet the fiscal demands of the City of Philadelphia. The purpose of this Department-wide standard operating procedure (SOP) is to achieve uniformity in performance of our public service mission and to provide consistency in determining the need, use, distribution and management of overtime usage.

  B. In addition to Directive # 13 – Court Notices and Subpoenas and Memorandum 09-01- Overtime Management, personnel will adhere to the roles and responsibilities contained in this Standard Operating Procedure.

II. **ROLES AND RESPONSIBILITIES**

  A. Commanders/Managers shall be responsible for approving **Non-Court Overtime** assignments for employees within their respective unit, bureau or division.

   i. Commanders/Managers shall be responsible for ensuring that overtime usage is being used appropriately and effectively, and that all employees in their respective units are complying with the following standard operating procedure.

  B. Commanders/Managers shall approve all overtime assignments **prior** to overtime being worked by PPD personnel. **Advance authorization** is required for overtime usage, unless exigent public safety and/or emergency conditions exist which necessitate approval after overtime usage has occurred.

  C. The following approvals shall be required for all overtime usage:

   i. Commanding Officers shall approve all overtime for investigative personnel.

    a. The Commanding Officer may give discretion to Platoon Commanders to approve investigative overtime for two (2) hours provided that the investigation does not involve more than two officers.

    b. The Commanding Officer must approve all overtime greater than two (2) hours and up to six (6) hours, as well as situations that arise where more than two officers are needed on a particular case.

    c. The Divisional Commanders (Inspector) must approve all investigative overtime **greater** than six (6) hours. There is no exception to these procedures and approval cannot be delegated to supervisory personnel.

  D. The **Overtime Authorization Form (75-57)** shall be issued to all employees within each unit, and be completed by the employee requesting overtime.

III. **FIELD OPERATIONS: PATROL, NARCOTICS AND INVESTIGATIVE UNITS PROCEDURES AND GUIDELINES**

  A. All Court Notices, especially Preliminary Hearings, will be reviewed by supervisory personnel to determine whether the Officers appearance is necessary. All supervisors will be alert to the

number of Officers/Investigators subpoenaed for a particular case, and be aware of the number of consecutive days an investigator has been subpoenaed.

In those cases where more than **three (3) officers/investigators** are subpoenaed for court on the same case, an immediate review of all investigative reports will be initiated by the Commanding Officer and take action when warranted. As stated in Memorandum 09-01 Overtime Management III-D-2, whenever there are six (6) or more personnel subpoenaed on the same case, the supervisor will contact the overtime management unit to refer the case for their review.

B. As per Memorandum 09-01 Overtime Management, when personnel are subpoenaed for court on a scheduled day off (SDO), the platoon supervisor shall initiate an immediate review of the case and arrest paperwork to determine the need for the Officer's appearance. If it appears that the Officer/Investigator is unnecessary, the supervisor shall contact the Overtime Management Unit to refer the case for their review.

C. Supervisors will not attend court without the approval of the Commanding Officer. Supervisors will ensure they are directing the investigation and not placing themselves in a position that will require their testimony at a later date. It is critical that supervisors fully understand their role, and on those rare occasions when they are needed for court, Commanding Officers' approval will be necessary.

D. All Investigative Supervisors will be required to review and initial all investigative reports, including PARS reports, and only those officers necessary for prosecution will be subpoenaed to court, as outlined in our departmental policies. **All PARS arrest reports must be reviewed and/approved by a Supervisor within ten (10) hours upon completion of the PARS Arrest Report**

E. The **assigned supervisor** maintains the overall responsibility for the number of police personnel involved in **case management**. When feasible, the lead investigator, or co-investigator, will assume responsibility for handing multiple components of each case, including collecting physical evidence, writing property receipts, taking statements, and assuming the role of affiant on the search or arrest warrant. The narrative description included on all search or arrest warrants should match these assigned roles and responsibilities.

i.   Investigative supervisors shall review search and arrest warrants to ensure that the above practices are followed, and that each component of case management is handled by as few police personnel as possible, as needed for the successful prosecution of the case.

ii.  The assigned investigator or controlling officer will be responsible for conducting the necessary surveillance related to his/her Investigation.

iii. The assigned investigator will be responsible for preparing all search warrant(s) and/or arrest warrant(s) during a single investigation. Additionally, when feasible, if the investigation necessitates serving search warrants at multiple locations, the assigned investigator will be the affiant on each search warrant. The type and complexity of the investigations controls the number of officers directly involved in subsequent prosecution of the accused. In most cases, the affiant (assigned investigator) should obtain all search and seizure warrants, seize incriminating evidence/fruits of the crime, and prepare necessary property receipts.

iv.  The assigned officer/investigator should also be the confiscating officer and prepare necessary property receipts. During the execution of search and seizure warrants, all evidence will be seized by the confiscating officer. Officers participating in the search will not take custody of the evidence, but merely point out to the confiscating officer the location of the found evidence. The confiscating officer will take possession of the evidence and record on a property receipt. Officers will at all times follow proper chain of custody procedures.

v.  In most cases the assigned investigator should be responsible for the interview and interrogation of the accused. Formal statements taken from defendants should be limited to the lead investigator or his/her partner.

vi.  The assigned investigator will be responsible for conducting all field tests related to their investigations.

vii.  The assigned investigator will be responsible for preparing all property receipts (75-3) associated with an investigation. All provisions of Police Directive #91 Property Receipts will be strictly followed.

viii.  Supervisors will no longer be listed on the PARS 75-49 as recording or reviewing the departmental "buy" money. This information will instead be listed on the squads sending and receiving sheet. Controlled "buys" made by confidential informants will be witnessed by the lead investigator and/or co-investigator.

ix.  The District Attorney's Office during some cases may also subpoena the officer/investigator for testimony relative to the "Report of Field Tester Affidavit" for a preliminary hearing. This is an unnecessary court notice, and the investigative supervisor shall contact the District Attorney's Office directly, and notify him/her that the affidavit serves as a sufficient basis to proceed in a preliminary hearing, without the direct testimony of the field test officer/investigator.

## V. FINAL AUTHORITY AND INTERPRETATION

A.  Overtime abuses or failures to comply with the above standard operating procedures may be subject to disciplinary action.