# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Obina Onyiah | ) |
|     Plaintiff | ) |
|     vs. | ) |
| | ) |
| | ) NO. 2:22-cv-01556 |
| | ) |
| City of Philadelphia, Pitts, Jenkins et al. | ) |
| | ) |
|     Defendants | ) |

_____

## ORDER

AND NOW, this            day of            , 202_, upon consideration of

Defendants' Partial Motion to Dismiss, and Plaintiff's Response in Opposition

thereto and Plaintiff's withdrawal of certain claims, it is hereby ORDERED and

DECREED that the remainder of the Defendants' Motion to Dismiss is DENIED.


BY THE COURT


_____

                               J.

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Obina Onyiah                              )
     Plaintiff                       )
     vs.                            )
                                    )
                                      )  NO. 2:22-cv-01556
                                      )
City of Philadelphia, Pitts, Jenkins et  )
al.                                      )
     Defendants                    )

_____

## PLAINTIFF'S RESPONSE
## TO DEFENDANTS' PARTIAL MOTION TO DISMISS

Plaintiff, Obina Onyiah, by and through counsel of record, does hereby respond to the Defendant City of Philadelphia ("City") and Defendants former Police Commissioner Charles Ramsey, Detective Ohmarr Jenkins, and Detective Thorston Lucke (collectively, "Defendant Detectives") Motion for Partial Dismissal brought pursuant to Fed.R.Civ.P. 12(b)(6).

In support of this Response, the Plaintiff incorporates the attached Memorandum of Law. Plaintiff respectfully requests that this Court deny the Defendants Motion as to all claims that have not been withdrawn.

/s/ Teri B. Himbaugh _____
Teri B. Himebaugh, Esq.
1400 Spring Garden St. #911
Philadelphia PA 19130
PA ID 53603
(484) 686-3279
*Counsel for Plaintiff*

/s/Alan E. Denenberg _____
Alan Denenberg, Esq.
1315 Walnut St. #500
Philadelphia, PA 19107
PA ID 54161
(215) 546-1345
*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Obina Onyiah                                )
    Plaintiff                           )
    vs.                                  )
                                         )
                                         )  NO. 2:22-cv-01556
                                         )
City of Philadelphia, Pitts, Jenkins et )
al.                                          )
    Defendants                           )

---

# PLAINTIFF'S RESPONSE
# TO THE DEFENDANTS' PARTIAL MOTION TO DISMISS

## I.   <u>Introduction</u>

Plaintiff, Obina Onyiah, by and through his undersigned counsel, hereby files this Memorandum of Law in Support of the Opposition to Defendants' Partial Motion to Dismiss.

In May 2013, Onyiah was tried by a jury before the Honorable Sandy L.V. Byrd and convicted of second degree murder, three counts of robbery, conspiracy to commit robbery and VUFA. See Exhibit "D" (Amended Complaint ¶107). He was sentenced to life in prison without parole.

On May 9, 2016, after his direct appeals had been completed, Onyiah filed a Post-Conviction Relief Act petition alleging his actual innocence and asserting that the Defendant Detectives Pitts and Jenkins had a pattern and practice of using coercion, physical force and threats to obtain a false confession which violated his

constitutional rights under the Due Process Clause. (Amended Complaint ¶108-115)

The Conviction Integrity Unit of the Philadelphia District Attorney's Office investigated and filed a joint stipulation of facts. (Amended Complaint ¶116). On May 4, 2021 the Honorable Tracy Brandeis-Roman of the Court of Common Pleas for Philadelphia found that Onyiah was actually innocent and vacated his conviction. (Amended Complaint ¶117). The Commonwealth thereafter *nolle prossed* all the charges. This civil action arises out of the intentional misconduct by Defendant Homicide Detectives James Pitts, Ohmar Jenkins and other defendants which resulted in the wrongful conviction and imprisonment of Onyiah for over eleven years. (Amended Complaint ¶1)

II.   **Factual Summary**

   A. **The crime which Plaintiff was wrongly convicted of**

On Thursday, October 21, 2010, William Glatz, Margaret Colbridge, Eric Stiess, and Paul Brewington were all inside the William Glatz Jewelry store, located at 6435 Rising Sun Avenue. (Amended Complaint ¶17-20)

The prosecution alleged that approximately a week prior to the crime, Onyiah saw Jamal Hicks at a basketball court. Hicks convinced Onyiah to meet him at Church's Chicken parking lot near Frankford Terminal. (N.T. 5/22/13 pg. 57).

On October 19, 2010 Turner and an unidentified black male went to the jewelry store. The next day, Turner went again, but alone. (N.T. 5/28/13 pg. 58).

The prosecution further alleged that on October 21, 2010 Onyiah met Hicks who was driving a dark green car with tinted windows. Onyiah got inside the back passenger seat. A black male  (Turner) was also in the car. (N.T. 5/22/13 pg. 58). When they got to the jewelry store Hicks parked the car. Turner handed Onyiah a gun. Hicks gave him a baseball hat to wear. (N.T. 5/22/13 pg. 58).

Prosecutors further alleged Onyiah and Turner entered the jewelry store around 11:00 a.m. Turner and Onyiah approached Colbridge and asked her to remove a link from Turner's watch. (N.T. 5/28/13 pg. 56). Colbridge took the watch to Glatz, who was in the back room of the store. On her way to the back room, she noticed that Brewington had left two of his bags in the front of the store. She put one bag over the counter and dragged the other one to the back of the store. (N.T. 5/28/13 pg. 56). Onyiah and Turner followed her as she entered the back room. When they reached the back room, Turner approached Stiess and put a gun to his head. Stiess complied with Turner's order to drop whatever was in his hand and dropped his gun on the floor.

The prosecution alleged that Onyiah grabbed Colbridge and put a gun to her head. (N.T. 5/28/13 pg. 57-58, 60). Colbridge struck Onyiah's arm, knocked his gun away, and ran for help. (N.T. 5/28/13 pg. 57) As she fled, Turner yelled to Onyiah: "Get her, shoot her." Onyiah chased Colbridge, but she ran from the store toward the pharmacy to her left, where she asked the attendant to call police. Onyiah ran across the street, entered a waiting vehicle parked at Argyle and Levick Streets and fled the scene. (N.T. 5/28/13 pg. 57).

Inside the jewelry store, Turner was still holding a gun to  Stiess' head. Brewington had his hands down and his back turned to show that he was not a threat. Turner ordered Stiess to approach him, and as Stiess complied with that command, Glatz reached for his gun. Turner and Glatz then exchanged gunfire. Turner shot Glatz and in turn, Turner was shot by both Glatz and Stiess. A bullet nearly struck Brewington. (N.T. 5/21/13 pg.30) (Amended Complaint ¶17-20).

When the shooting was over, Glatz and Turner were on the floor. Stiess picked up his gun from the floor and shot Turner in the head. He then took the gun from Turner's hand. The men called 911 and police arrived within one to two minutes. Glatz was pronounced dead at Albert Einstein Medical Center.

### B. The investigation and prosecution

Homicide detectives quickly identified the deceased perpetrator as Turner, who escaped from Curran Fromhold Correctional Institution (CFCF) on October 12, 2010 where he was being held on a weapons charge. (Exhibit D: Cmwth. Stipulation ¶13). Homicide detectives began looking at phone numbers from Turner's recent calls from CFCF, as well as phone numbers in the phone recovered from Turner at the jewelry store, and Turner's co-defendants in his prior robberies.  A still photo of the unidentified thin black male obtained from the surveillance video was released to the press.  (Exhibit D: Cmwth. Stipulation ¶14-16).

According to the Commonwealth's latent fingerprint expert Patrick Raytik, the fingerprints found on the jewelry store display cases could <u>not</u> be attributed to Onyiah, Turner, or Hicks.

Detectives Lucke and Dunlap recovered surveillance video from three security cameras inside the jewelry store. Defendant Lucke extracted a still photo of the profile of the head of the second male who fled the store and compiled the relevant time frames chronologically onto one video. (Amended Complaint ¶30, 31). This video and Defendant Lucke's testimony would be key to both convicting Onyiah and proving his actual innocence.

On October 19, 2010, at 10:30 a.m., the video displayed two men entering the store. One of the men was Turner, who was significantly taller and had a bigger build than the other man. It is uncontested that Turner measured 6' 1" tall. (Exhibit D: Cmwth. Stipulation ¶5). The second man was of a thin build, had a medium brown complexion, and was wearing a loose reddish orange hoodie. At 10:39 a.m., the two men are seen exiting the store.

The October 21, 2010, the day of the crime, the video showed Turner and a thin man who the Commonwealth alleged was close to Turner's 6' 1" height. That second man was wearing a dark hat, dark hoodie, dark pants, and white sneakers. The prosecution alleged that this second man was Onyiah.

Turner pulled out a large dark silver semi-automatic gun and the second man retrieved an item from his waistband. The video also showed Colbridge

running toward the front door with the second man running behind her out the door with a gun in his right hand.

At 12:25 p.m. that same day, homicide detectives also interviewed Suzanne Duffy, a witness who was walking on Rising Sun Avenue and saw the black male flee the crime scene – according to Duffy, this suspect was "maybe 19-20, very thin build, under 6', maybe around 5'8", somewhere around there." (Exhibit D: Cmwth. Stipulation ¶ 10) (Amended Complaint ¶28).

On October 23, 2010, Raneisha Carter provided a statement to Homicide Detectives after viewing a newspaper article that showed the above cited photo. Carter thought that the man depicted in the photograph was Donte Waters, her son's father. (Amended Complaint ¶ 33). Waters had reported that he was 5'9" when he was arrested in September 2010. (Amended Complaint ¶38)

Detectives subsequently verified that Waters was not in custody on the day of the homicide (or the two days before the homicide).(Exhibit D: Cmwth. Stipulation ¶17-20) (Amended Complaint ¶38).

Carter said she had last seen Waters in court on October 22, 2010.  Records show the court modified Waters' bail conditions on October 22, 2010 and, as a result, he was in custody at CFCF starting on that date. Waters was not released from CFCF until February 21, 2013. Waters had two open misdemeanor cases and was on probation for his prior robbery at this time (for which a violation of probation was filed, likely around the time of the October 22, 2010 bail hearing on

his open misdemeanor).  As a result, at the time of the investigation, Waters was represented by counsel throughout the homicide investigation in this case.

Notably, there is no documentation in the homicide file that homicide detectives ever went to CFCF to interview Waters or had him brought to homicide to conduct an interview. (Exhibit D: Cmwth. Stipulation ¶18 fn.4) (Amended Complaint ¶40). Defendant Det. Pitts testified at the suppression hearing that he had not interviewed Waters. However, Defendant Det. Pitts falsely testified at Onyiah's trial that he interrogated this suspect. (Amended Complaint ¶106(f)).

On the same day that Carter identified Waters as a suspect, detectives visited the respective homes of Colbridge and Stiess and showed them a photo array which contained Waters' photo.  Stiess positively identified _Waters_ as the thin black male that fled the jewelry store and Colbridge identified Waters' photo as looking "like the other guy from the store but I can't say that his hair looks like this because he was wearing a baseball cap."   (Exhibit D: Cmwth. Stipulation ¶21-23) (Amended Complaint ¶36, 37).

Following the two positive identifications of Waters, homicide detectives obtained Waters' criminal history, which included a robbery conviction from 2008. On October 24, 2010, homicide detectives obtained a search warrant for Waters' residence and recovered clothing they believed was similar to that worn by the thin black man, including a "fitted hat." (Amended Complaint ¶39).

Without any documentation that homicide detectives ever interviewed Waters, the investigation into him largely ended because, on October 25, 2010,

homicide detectives received a call from the girlfriend of an inmate at a federal jail, Donnell Cheek, claiming Cheek had information about this case. (Exhibit D: Cmwth. Stipulation ¶24) (Amended Complaint ¶41).

On November 4, 2010, Donnell Cheek provided a statement to Detectives Cummings and Glenn.[1] Cheek provided this statement after he saw a still photograph three times on television news while he was in a Camden County prison. (Amended Complaint ¶ 43). He immediately called a friend and asked her to contact the news station. Cheek also spoke with his attorney. (Amended Complaint ¶ 42). On September 29, 2010, Cheek entered into a federal plea agreement and a cooperation agreement with the U.S. Attorney's Office. As a result of Cheek's cooperation in this case, the U.S. Attorney's Office offered to file a motion to reduce his federal sentence. (Amended Complaint ¶45) At Plaintiff's trial Cheek refused to testify until the Court threatened to hold him in contempt. He then relented and testified consistent with his proffer. (Amended Complaint ¶ 106(d)).

On November 7, 2010, homicide detectives obtained a search warrant for Onyiah's mother's house. (Amended Complaint ¶ 44). The search warrant was executed at 6:09 a.m. on November 8, 2010. The detectives found and seized nothing other than Onyiah's learner's permit application. (Exhibit D: Cmwth. Stipulation ¶28).

---

[1]     It is believed that these officers may be Defendant Detectives John Doe 1 and 2). (Amended Complaint ¶ 42).

On November 8, 2010, at 10:10 am Defendant Pitts interviewed Chioma "Christine" Onyiah, the Plaintiff's sister. (Amended Complaint ¶ 47). The PPD homicide file contains a written statement taken by Defendants Pitts and Jenkins dated November 8, 2010 at 10:10 a.m. following the interview of Christine.  The actual interview itself, however, is not documented anywhere in the file. (Exhibit D: Cmwth. Stipulation ¶30) (Amended Complaint ¶48).

According to the Defendant detectives' statement, Ms. Onyiah told them where her brother was, provided them with his contact information and identified him as the person in the still photograph take from the video footage. (Amended Complaint ¶ 49,50). Defendant detectives told Ms. Onyiah that she needed to set up a meeting with him so that her brother would be safe.  (Amended Complaint ¶ 52).  Ms. Onyiah arranged for her brother to meet her outside a McDonald's where Onyiah was detained and transported to the Homicide Unit. (Amended Complaint ¶51, 62, 63).

Onyiah arrived at Homicide at approximately 3:00 p.m. on November 8, 2010. (N.T. 5/22/13 pg 25-30; *Commonwealth v. Onyiah*, 3010 EDA 2013 (Pa. Super. 9/28/15)(citing to the Trial Court Opinion, 5/30/14 pg. 2-12)). He was held in an interrogation room, handcuffed to a table, until 10:55 pm – over seven hours - before he was *Mirandized* and detectives began interrogating him.[2] (N.T.

---

[2]     At the suppression hearing Defendant Detectives Pitts and Jenkins testified that they gave Onyiah verbal *Miranda* warnings while interviewing him for thirty to forty minutes before giving him his 'formal' Miranda warnings. (Amended Complaint ¶99)

5/29/13 pg 63,65,98)(N.T. 5/22/13 pg. 84; 5/29/13 pg. 90,97) (Amended

Complaint ¶65, 71, 90).

According to Onyiah, Defendant Det. Pitts immediately told Onyiah that they

knew that he had committed the robbery/murder with Turner. (Amended

Complaint ¶ 73). Prior to Defendant Det. Pitts saying this, Onyiah had no idea that

this crime had been committed or who Turner even was. He had never heard of or

met Turner.  (Amended Complaint ¶74)

During the course of that interrogation, Defendant Det. Pitts got 'in Onyiah's

face', aggressively yelling and spitting at him in an intimidating manner.

(Amended Complaint ¶ 75).  In full view of, and without any objection from

Defendant Det. Jenkins,  Pitts punched Onyiah, who was still handcuffed to the

table, three times in his chest and two times to the shoulders. (Amended

Complaint ¶76). It is believed and averred that Defendant detectives intentionally

avoided causing injury to Onyiah's face to avoid discovery that physical force had

been used. (Amended Complaint ¶81, 94). In fact, at the suppression hearing the

Commonwealth argued that Plaintiff's girlfriend at the time, Kathryn Cardona, was

not telling the truth about the assaultive and coercive interrogation of Onyiah

because his mugshot did not show any bruising. (Amended Complaint ¶102). [3]

In abject fear, and to stop the abuse from Defendant Det. Pitts, Onyiah

ultimately gave in and just told them what he thought they wanted him to say

---

[3]    Onyiah is dark complexioned, and bruising would not show up in any picture.
Moreover, the mugshot was taken two days after the Defendants assaulted
Plaintiff. (Amended Complaint ¶103).

regardless of the fact that it was not the truth. (Amended Complaint ¶ 77).
According to a November 8, 2010 Activity Sheet completed by the Defendant
Detectives: "While at homicide, Onyiah waived his constitutional rights and gave a
statement in which he admitted his role in the robbery/murder of William Glatz."
(Exhibit D: Cmwth. Stipulation ¶35) (Amended Complaint ¶91).

They took Onyiah from the interrogation room to a cubicle that had a
computer. The detectives pulled up pictures of males on the screen and asked him
if he could identify them. (Amended Complaint ¶ 78). When Onyiah kept saying
"no" to each photograph Defendant Det. Pitts, in full view and without any
objection from any of the other Defendant detectives and/or supervisors, became
enraged. He grabbed and squeezed the back of Onyiah's neck and forced his head
down between Onyiah's legs while yelling at him. (Amended Complaint ¶ 79).
Ultimately, in fear and pain, Onyiah just identified who Defendant Det. Pitts clearly
wanted him to identify. (Amended Complaint ¶80).

Defendant Det. Pitts repeatedly and vehemently, denied under oath at the
suppression hearing and at trial that any physical or psychological force was used
to compel the alleged disclosures from the Onyiah. (Amended Complaint ¶149). In
fact, he stated several times that he "never touched" Onyiah.  (N.T. 5/22/13 pg.
88-89; 5/29/13 pg. 103-104) (Amended Complaint ¶106(e)).

The interrogation ended at 1:20 a.m. the following day. (N.T. 5/22/13 pg.
64) (Amended Complaint ¶89, 92). Onyiah was not, however, 'officially' arrested,
processed, and taken out of the Homicide Unit until November 10, 2010- two <u>days</u>

after being taken into custody. (N.T. 5/22/13 pg. 67, 84, 116-117; 5/29/13 pg. 78, 98) (Amended Complaint ¶93).

Emails between Ed McCann (First Assistant District Attorney),  Ann Ponterio (Chief Homicide Unit of the DA's Office) and ADA Jacqueline Coehlo refer to 'initial missteps' during the early part of the Homicide investigation. Ponterio warns that this was:

> . . .  a serious case, and it's a statement case. They will have to get by homicide detectives having him down there for a few hours. Whoever gets it, I want to make sure they know the law, because I don't want our homicide statement affected by what . . . homicide detectives say how they got him and how long he was there.

(Exhibit B).

According to Onyiah's then girlfriend, Kathryn Cardona, on November 8, 2010, detectives (including Defendant Det. Pitts) came to her house. (Amended Complaint ¶ 53, 54). Her friend Robert Iezzi, Jr. and her landlord, Anthony Brown were there when police arrived. (N.T. 5/22/13 pg. 172) (Amended Complaint ¶55).[4]

Cardona gave the police consent to search the house. (N.T. 5/29/13 pg. 139-140) (Amended Complaint ¶56). One of the detectives repeatedly stated that he knew that there were guns and money in the house. (Amended Complaint ¶ 57) Cardona, Iezzi and Brown were escorted outside while police searched the house for a gun and a fitted cap with a "C" on it. They didn't find either. (N.T. 5/22/13

---

[4]     Mr. Brown died several years ago.

pg. 174). No guns were recovered on Plaintiff, or any houses Defendants searched. (Amended Complaint ¶58 ).

At approximately 3:00 pm Ms. Cardona, Iezzi and Brown were then taken to the Homicide Unit at the Roundhouse. (Amended Complaint ¶ 59). For no apparent reason other than intimidation, Iezzi was placed in handcuffs when he was transported to Homicide and not permitted to make any calls. (Amended Complaint ¶ 60).

Defendant Detectives did <u>not</u> place Cardona, Brown or Iezzi's names in the daily Homicide Unit log despite it being a policy that detectives are to write the names of any witness and/or suspects who enter the Unit into the log. (Amended Complaint ¶61). This intentional lack of documentation allowed the detectives to effectively argue at Onyiah's trial that Cardona had lied about being at the Homicide Unit. (Amended Complaint ¶101)

Initially, Cardona and Brown were seated together on a bench approximately 30 feet from the Sargent's Office where Onyiah was being held. (N.T. 5/22/13 pg. 46-48, 115-125, 134-137) (Amended Complaint ¶ 66). Iezzi was taken to the interrogation room next to where Onyiah was held. (Amended Complaint ¶66).

While sitting there, they could hear Onyiah's voice coming from the Sargent's Office. (Amended Complaint ¶ 82). Notably, Defendant Det. Pitts testified that if you were sitting on that bench you could in fact hear if people in the interview rooms were even speaking loudly. (N.T. 5/22/13, pg. 76).

At some point, Cardona was taken into an interrogation room. (Amended Complaint ¶ 67). She could hear Onyiah voice coming from the room next to the room she was in. She also heard the voice of two other men. (N.T. 5/22/13 pg.177).

A white male detective with salt and pepper hair and blue eyes (Defendant John Doe) told her that her boyfriend was wanted for murder. Detectives then showed her a very dark black and white picture of a face in profile wearing a hoodie and a fitted baseball cap. (N.T. 5/22/13 pg. 209).

> He was like, is this him, is this Obina. And I immediately said no. Like, no, it's not him. He is like-- he said, don't fucking lie to me. He was like, I know you have his ass because you're fucking him. So don't lie to me because I will make sure that your kids are taken away. And yea, he basically just threatened me and tried to make me say that it was him when I knew it wasn't. . . Probably five minutes after that he showed me the picture and I kept saying, no, it's not him, but its not him. What do you want me to say. He slammed the picture on the table and just went hysterical. He just started screaming at me, you're a fucking whore. Of course, your going to have his ass because your sleeping with him. You're sleeping with your friend Iezzi. Your sleeping with all of them. . . The last thing he said, he was like, all right, if you're not going to tell me anything, fuck it. Take her back over there. Sit her back over there on the bench.

(N.T. 5/22/13 pg.179-181) (Amended Complaint ¶68 , 69, 70).

She could hear Onyiah screaming "stop hitting me." She heard multiple loud "thumps like" punches and two men say "stop f'ing around and tell us the truth." She recognized Onyiah's voice saying "yo man I ain't do nothing", "why are you hitting me", "stop hitting me" at least ten times while she, Iezzi and Brown were sitting there. (N.T. 5/22/13 pg.177-178,182-183, 195) (Amended Complaint ¶ 85, 86).

She was left sitting on the bench the rest of the night and kept hearing Onyiah scream and the same thumping coming out of the room by the detectives and the slamming of doors. (N.T. 5/22/13 pg. 34-35, 170-188).

At one point, Cardona saw a white detective come out of the room Onyiah had been in. He looked tired and he sat down put his hands up behind his head and said "I can't do this anymore. He's like, man, this is not our guy" (N.T. 5/22/13 pg. 186) (Amended Complaint ¶87). Then a black detective with the "big tissuey scar behind his neck" (Defedant Det. Pitts) came out of the room. (N.T. 5/22/13 pg. 186-187, 215). She asked him why they were hitting Onyiah, and Defendant Pitts looked at her and in a cocky way told her to "shut the fuck up and mind your own business". (N.T. 5/22/13 pg. 187) (Amended Complaint ¶88).

A third detective came up to her and showed her mug shot of a young black guy.

> (W)hen he showed me that mug shot, I am like, hold on.
> That looks like the guy of the picture you showed me
> in the back room. And he's said, I am not asking you
> all that. Do you know him. And I said 'No'. . . He
> looked like Obina but younger, way younger, and he had
> tattoos on his neck and had a teardrop on his eye on
> his face on the side.

(N.T. 5/22/13 pg. 188,209).

According to Iezzi,  the homicide detectives put him in handcuffs and put him in the back of a paddy wagon and they would not let him call his mom. Iezzi said once he went upstairs at the Roundhouse and they made a right, Onyiah was in the first room and he was in the second room where he was seated at a desk,

but not handcuffed. Iezzi remembered hearing Onyiah scream for what felt like an eternity. (Amended Complaint ¶ 83, 84).

Iezzi said he could also hear the detectives saying, "you did it, this is you." (Amended Complaint ¶ 84) Iezzi said he could hear Onyiah saying he didn't do it. Iezzi said he could hear the sound of punching.  Iezzi said they finally let him, Brown, and Cardona go somewhere around 1:00 or 2:00 a.m.  (Exhibit D: Cmwth. Stipulation ¶ 82-86). Iezzi's father, Robert Iezzi, Sr. Iezzi picked Iezzi, Brown, and Cardona up from the Roundhouse in the middle of the night. (Exhibit D: Cmwth. Stipulation ¶87-88).

On December 20, 2010, Det. Urban conducted a live lineup at CFCF that included five men and Onyiah, who was in the Number 4 position. The "fillers" were 6' and 180 pounds, 6'2" and 198 pounds, 5'11" and 201 pounds, 6'2.5" and 185 pounds, and 6'1" and 180 pounds.  (Exhibit D: Cmwth. Stipulation ¶ 39). Importantly, Waters was <u>not</u> in this line up. Colbridge, Stiess, and Brewington were present and viewed the lineup.

 Brewington could not identify <u>anyone</u>, but he described the second man as a black male in his 20s who was about 5' 7" to 5' 8" tall;  noticeably *shorter* than Turner's 6' 1".  (Amended Complaint ¶ 26) This second male weighed between 150 to 160 lbs. and had a younger complexion with full lips. He had been wearing dark pants, dark sweatshirt with a hood and a baseball cap. (Exhibit D: Cmwth. Stipulation ¶ 9) (Amended Complaint ¶25, 27).  It is uncontested that Onyiah was 6'3**"**  and weighed 195 pounds. (Exhibit D: Cmwth. Stipulation ¶ 36, 68)

(Amended Complaint ¶29).

Steiss initially described the thin, black male as: "black guy, early twenties, light skin about 5'8", thin build, he was wearing a cap of some sort with an insignia, with a dark colored hooded sweatshirt, he had a large caliber revolver it seemed dark colored." (Exhibit D: Cmwth. Stipulation ¶ 11) (Amended Complaint ¶23). At the lineup, Stiess identified Onyiah.

Colbridge had previously described the thin black male who fled the scene as "very slight of build, maybe around 5' 7" and maybe between the ages of 16 and 20. (Exhibit D: Cmwth. Stipulation ¶8) (Amended Complaint ¶24). After seeing the lineup, Colbridge stated  "I *think* it was Number 4."

Notably, emails between Ed McCann (First Assistant District Attorney),  Ann Ponterio (Chief Homicide Unit of the DA's Office) and ADA Jacqueline Coehlo refer to these eyewitnesses' failure to identify the Plaintiff during those line ups as 'mis-identifications' and discuss how they are problematic to the prosecution. (Exhibit B).

Colbridge and Stiess identified Onyiah at his preliminary hearing and at trial. Brewington, who did not testify at Onyiah's preliminary hearing, identified the Onyiah at trial. He explained that he was able to make this identification *after* he independently viewed videotapes of the incident.

Defendant Lucke testified the height of the thin black male depicted in the video was central to the defense's theory at trial, however, he told the jury that

there was no way to calculate the heights of the people in the video. (Exhibit D: Cmwth. Stipulation ¶42) (Amended Complaint ¶32).

During the post-conviction appeal that resulted in Onyiah's exoneration, the CIU retained certified FBI experts to evaluate the surveillance video and determine what, if anything, could be determined about the height of the second suspect — the thin, black male in the video. Three different photogrammetry experts independently conducted a forensic analysis of the surveillance video in this case and all three concluded that, measuring from the highest point at the top of the hat (including the hoody), the thin black male is *no taller than* 5'11" and most likely a little shorter. It is uncontested that Onyiah is 6'3".  Therefore, the video analysis conclusively <u>excludes</u> Onyiah as the thin black male seen in the surveillance video.

 On March 3, 2022, following Onyiah's exoneration, Pitts was indicted by an investigating grand jury of multiple charges of perjury and abuse of authority. (Amended Complaint ¶184 (a). He is currently awaiting trial on those criminal charges. It was only after the above that Defendant Pitts was ultimately terminated from the Philadelphia Police Department.


**III.   <u>Legal Standards</u>**

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of the allegations set forth in the complaint to determine whether they properly state a claim for relief. A motion under this Rule

challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced.

The motion should not be granted unless it appears to a certainty that the Plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim. If, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient. *Austin v. Clark*, 294 Ga. 773, 774–775, 755 S.E.2d 796 (2014); *Webb v. Bank of Am., N.A.*, 328 Ga.App. 62, 761 S.E.2d 485 (Ga. App. 2014).

In other words, a plaintiff is "required to make a 'showing' rather than a blanket assertion of an entitlement to relief." *Smith v. Sullivan*, 2008 U.S. Dist. LEXIS 12361, 2008 WL 482469, at *1 (D. Del. Feb. 19, 2008) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)). "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 556 n. 3). Although the United States Supreme Court does "not require heightened fact pleading of specifics, the Court does require enough facts to state a claim to relief that is plausible on its face.

For purposes of this motion, all the well-pleaded allegations of the complaint must be accepted as true. *Erickson v. Pardus*, 551 U.S. 89, 93-94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007). Any disputed issues are construed favorably to the Plaintiff/complainant, and all reasonable inferences are drawn in favor of the

Plaintiff/complainant. § 11.07, Motion To Dismiss For Failure To State a Claim (Guide to TTAB Practice). *Tracinda Corp. v. DaimlerChrysler AG,* 197 F.Supp.2d 42, 53 (D. Del. 2002); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

## IV.  <u>ARGUMENT</u>

### A. <u>Plaintiff's Claim of Bystander Liability/Failure to Intervene is clearly established and Defendants are not entitled to Qualified Immunity</u>.

The law provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 2738, 73 L.Ed 2d 396 (1981); *Heron v. City of Philadelphia*, 987 F.Supp. 400 (E.D. Pa. 1997).

Because qualified immunity is an affirmative defense, Defendants bear the burden of establishing that they are entitled to the immunity. *Ryan v. Burlington County, N.J.*, 860 F.2d 119, 1204 n. 9 (3d Cir, 1988), *cert. denied*, 490 U.S. 1020 (1989); *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995).

In resolving the qualified immunity question, the court must follow the two-step inquiry set forth by the Supreme Court in *Saucier*. *Saucier v. Katz,* 533 U.S. 191, 121 S.Ct. 2151 (2001).  First, as a threshold matter, the court must determine whether "the facts alleged show the officer's conduct violated a constitutional right."  *Saucier*, 121 S. Ct. at 2156.  "[T]he proper inquiry at this stage is whether Plaintiffs have <u>*asserted*</u> a constitutional violation, as opposed to

whether Plaintiffs have <u>demonstrated </u>one." *Shellem v. Mays*, 2000 WL 1597766, *3 (M.D. Pa.) (emphasis in original). Accordingly, the focus of this initial inquiry is to determine if the plaintiff has alleged sufficient facts to ascertain "the existence or non-existence of a constitutional right." *Id*.

The next sequential step is to determine whether the right was clearly established at the time. *Saucier*, 121 S. Ct. at 2156; *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The dispositive inquiry in determining whether a right is clearly established "is whether it would be clear to *a reasonable official that his conduct was unlawful in the situation confronted."* (emphasis added) *Id*. This is an objective test, and accordingly officials' subjective beliefs are irrelevant to the analysis.

Plaintiff has alleged in Count IV of his Amended Complaint that the Defendant Detectives have a duty to prevent other Philadelphia Police officers from violating the constitutional rights of Philadelphians. (Amended Complaint ¶154-156). In support of that claim the Plaintiff further alleged that Defendant Detectives Jenkins, Lucke and/or John Doe 1-10 were present and/or otherwise aware that Defendant Det. Pitts obtained the false confession from Plaintiff through the use of verbal and physical force and other unlawful coercive means. The Defendant Detectives had to have been aware that the statement attributed to the Plaintiff was involuntary and very likely materially false.

The Third Circuit has held that it is well established that police officers must have probable cause to arrest and charge suspects. *Harvard v. Cesnalis* , 973 F.3d

190, 199–203 (3d Cir. 2020). If they do not, they may be liable for malicious prosecution. *Lozano v. New Jersey*, 9 F.4th 239 (3rd Cir. 2021). Defendant Detectives knew or should have known that any beating of a false confession out of a suspect or witness cannot serve as the basis for probable cause to arrest and charge.

The Third Circuit has long held that Detectives are liable for fabricating evidence to convict a criminal defendant. *Halsey v. Pfeiffer*, 750 F.3d 273, 296 (3d Cir. 2014) *Halsey* explains that an officer is on notice and thus liable if they use fabricated evidence to prosecute or convict, especially if the detectives themselves fabricated the evidence used to do so. *Id*. This decision was recently affirmed by the Third Circuit yet again in Dennis v. City of Philadelphia, 19 F. 4th 279 (3d Cir. 2021)

Defendant Det. Jenkins witnessed firsthand Defendant Det. Pitts abuse of the Plaintiff in that he was in the interrogation room with them. He was also an eyewitness to the statement being taken by Defendant Det. Pitts. Defendant Det. Jenkins failed to prevent, intervene, document, or report the fact that the confession had been the product of coercion and physical force.

The other Defendants who were outside the interrogation room had to have heard the Plaintiff's yelling and crying and other sounds of his being physically abused coming from the interrogation room. These sounds were readily identified by Cardona, Iezzi and Brown and would have been equally identifiable by the Defendants. These Defendants did not however intervene to ensure that the

statement was taken voluntarily.

Additionally, Det. Jenkins and the other Defendants did not at any point prior to (or after) Plaintiff's conviction report to supervisors or the District Attorney's Office that the Plaintiff's confession had been coerced. (Amended Complaint ¶157-158). Instead, Defendant Detectives permitted Plaintiff's prosecution to proceed on the false assumption that Plaintiff had confessed, and that confession was both entirely voluntary and verbatim. Notably, Defendant Det. Jenkins did not correct Det. Pitts pre-trial or trial testimony wherein he asserted that the Plaintiff's confession was voluntary and verbatim despite the fact that he had firsthand knowledge that it was not. Defendant Dets. Pitts and Jenkins intentionally advanced fabricated evidence in order to convict the Plaintiff.

Defendants allege in their Motion to Dismiss that Plaintiff's claim based upon bystander liability/failure to intervene is not clearly established in any context except that of excessive force. (Motion to Dismiss pg. 8-9).

The Third Circuit has held that " in order for the governing law to be sufficiently well established for immunity to be denied, it is <u>not</u> necessary that there has been a previous precedent directly on point." *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989). It is enough if there is "some but not precise factual correspondence to the precedent." *Stoneking v. Bradford Area School District*, 882 F.2d 720, 726 (3d Cir. 1989) (quoting *People of Three Mile Island v. Nuclear Regulatory Comm.*, 747 F.2d 139, 144 (3d Cir. 1984)).

The Third Circuit has not directly spoken as to whether a plaintiff may sustain a claim under §1983 against an officer who did not participate directly in an unlawful and malicious prosecution. However, it has decided cases which contemplate and specifically do not rule out liability under those facts.

For example, in *Smith v. Mensinger*, 293 F.3d 641, 650-52 (3d Cir. 2002) the Third Circuit held that "(i)f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation <u>such as</u> an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.") Critically, the *Smith* court cited 'excessive force' as an example of a constitutional violation where failure to intervene could be alleged.

Similarly in *Herrera v. City of New Brunswick*, Civ. No. 04-3002, 2008 U.S. Dist. LEXIS 7532, 2008 WL 305275, at *10 (D.N.J. Feb. 1, 2008) the District Court held that a police officer can be held liable under § 1983 if she fails to intervene when *a constitutional violation occurs in her presence*. Again, the District Court did not distinguish between types of constitutional violations or limit the claim to excessive force.

In *Rumbas v. Borough of Lawnside*, 2008 U.S. Dist. LEXIS 60712 (U.S.D.C. N.J. August 6, 2008) the District Court found that while not argued by the defendant Borough as a basis for their motion  ". . . police officers may be held liable under §1983 when they knowingly fail to intervene when another officer in their presence unlawfully arrests a person, where the officer had a reasonable opportunity to intervene. See also Third Circuit Model Jury Instructions: Civil §

4.6.2 (2007). *Id*.

Moreover, there are a significant number of cases from other circuits that have permitted §1983 failure to intervene claims which were brought outside the context of excessive force to proceed:

- *Gragnon v. Ball*, 696F.2d 17, 21 (2d Cir. 1982) (holding an officer liable for failing to intervene in a false arrest))

- *Yang v. Hardin*, 37 F.3d 282,285 (7th Cir. 1994)(holding that an officer is liable under §1983 if the officer is present and has reason to know that a citizen has been "unjustifiably arrested" but fails to intervene)

- *Byrd v. Clark*, 783 F.2d 1002, 1007 (11thCir.1986)(use of excessive force as only one example of a constitutional violation where bystander liability could be pled).

- *Randall v. Prince George's County, Md*., 302 F.3d188, 203-04 n.23 (4th Cir. 2002) (holding that bystander liability under § 1983 extends beyond cases of excessive force, including false arrest <u>*and other constitutional violations*</u>)

- *Smith v. Hunt*, 2010 U.S. Dist. LEXIS 101526 (N.Dist. Illinois 2010)( a police officer "has a duty under §1983 to intervene to prevent a false arrest or the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it.")

- *Crawford v. City of Chicago* 2014 U.S. Dist. LEXIS 57720 (N. Dist. Illinois 2014)(there is an existing duty to intervene in any unconstitutional conduct where the officer knows a constitutional violation is occurring and the officer has a realistic opportunity to intervene and prevent the harm from occurring).

- *Woody v. City of Granite City, Ill.,* Civ. No. 17-534, 2018 U.S. Dist. LEXIS 13920, 2018 WL 587517, at *2 (S.D. Ill. Jan. 29, 2018) (plaintiff who alleged that police defendants knew of the building and zoning defendants' actions (which included harassment, assault, invasion of property, and issuance of baseless citations), had the power to present the actions, and did nothing, had stated a § 1983 failure to intervene claim)

- *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (explaining "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.")

*Smith v. Mensinger* was decided by the Third Circuit in 2002. Both the *Rumbas* and *Herrera* decisions were made in 2008 – five years before Plaintiff's 2013 criminal prosecution. Plaintiff avers that they provide adequate notice to the Defendants that bystander liability/failure to intervene could apply to constitutional violations that are unrelated to the use of excessive force such as the one at bar.

Moreover, Plaintiff avers that the issue of qualified immunity cannot be determined by this court prior to trial. While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination. *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6 (1987) *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 190-92 (3d Cir. 1984); *Abdul-Akbar v. Watson*, 4 F.3d 195, 201 (3d Cir. 1993); *White v. Walker*, 950 F.2d 972, 976 (5th Cir. 1991); *Oliveira v. Mayer*, 23 F.3d 642, 649 (6th Cir. 1994) *D'Arrigo v. Gloucester City*, 2007 WL 1755970, *6 (D.N.J.)

This case is one of the rare instances in which the question of qualified immunity cannot be decided at the 12(b)(6) or summary judgment stage and must be left for the jury. *Karnes v. Skrutski,* 62 F.3d 485, 491 (3d Cir.1995)

("While the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed factual issues relevant to that determination."); accord *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir.1993) ("It must be recognized that even though [Hunter] diminished the jury's role in qualified immunity cases, it did not entirely abolish it); *Sharrar v. Felsing*, 128 F.3d 810, 825-27 (3d Cir.1997); *Heron v. City of Philadelphia*, 987 F.Supp. 400 (E.D. Pa. 1997).

Whether or not Defendant Detectives knew that Plaintiff's confession was fabricated and could have intervened to prevent the fabricated statement from being made and relied upon in Plaintiff's trial are disputed issues of material fact which preclude the court from granting these Defendants with qualified immunity.

### B. <u>Plaintiff has pled sufficient facts to assert a claim against the Municipality</u>

In Count VII of the Amended Complaint, the Plaintiff alleges civil rights violations by the City and former Commissioner Ramsey in the form of Police Department policies, practices and/or customs that permit and/or encourage Homicide Detectives to commit the misconduct that they committed in the instant case.

"A municipality can only be liable under section 1983 when the municipality itself causes the violation." *Baker v. Monroe Township*, 50 F.3d 1186, 1191 (3d Cir.1995), citing *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 1202, 103 L.Ed.2d 412 (1989). To establish municipal liability, a plaintiff must prove, in addition to a violation of his rights, that a policymaker for the City

"authorized policies that led to the violations or permitted practices that were so permanent and well settled as to establish acquiescence." *Baker* at 1191.

"A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict. Alternatively, a course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Monell*, 436 U.S. at 691), abrogated in part on other grounds by *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006), overruled in part on other grounds by *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) ; *McTernan v. City of York*, 564 F.3d 636, 657-58 (3d Cir. 2009). Under either scenario, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom. *Andrews*, 895 F.2d at 1480; *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).

The plaintiff additionally bears the burden of proving that the City's policy, practice, or custom was the proximate cause of the injury suffered. To establish the necessary causation, the plaintiff must demonstrate an affirmative link between the policy, practice and/or custom and the specific deprivation of rights at issue. *Bielevicz v. Dubinon*, 915 F.2d 845, 850-51 (3d Cir.1990). The question of the existence of proximate cause is for the jury. See id. at 851. *Heron v. City of*

*Philadelphia*, 987 F.Supp. 400 (E.D. Pa. 1997).

Former Commissioner Ramsey exercised final decision-making authority over the implementation and enforcement of all policies, practices, and customs within the Homicide Unit. (Amended Complaint ¶171-172). The polices, practices and customs which are relevant to the instant matter include, but are not limited to the following (Amended Complaint ¶183):

1. **<u>Pattern and practice of permitting coercive and abusive interrogations</u>**

Plaintiff asserted in Claim VII that Former Commissioner Ramsey was personally involved in the development of policies pertaining to the detention, interrogation and taking of statements from suspects. Plaintiff avers that the Defendant Detectives, with the knowledge, acquiescence and/or tacit sanction of supervisory Defendants, regularly used coercive and unconstitutional methods during their interrogation of witnesses and suspects. This was intentionally done in order to obtain fabricated and coerced statements/confessions and ultimately secure convictions. (Amended Complaint ¶176-178, 184).

These tactics included 1) targeting of witnesses/suspects who are perceived to be vulnerable; 2) using long periods of undocumented pre-interrogation isolation, often including limited or no use of the bathroom or provision of food to wear the witness/suspect down; 3) denial of counsel and/or family members; 4) threats from the Defendant Detectives about what would happen to the witness/suspect and his/her family and friends if they did not 'cooperate' and tell the detectives what they want to hear 5) manipulation of identifications by

eyewitnesses; [5] 6)  fabrication and/or supplying of information that was alleged to have been obtained from witnesses/suspects; 7) demanding that the witness/suspect sign an often unread statement before they would be permitted to leave; and 8) physical abuse of the witness/suspect.

When a witness/suspect asserted at a hearing and/or at trial that their statement was fabricated and/or coerced, the prosecution would routinely call the Defendant Detectives to the stand. The Defendant Detectives would then commit perjury, refuting the witness' testimony and affirmatively asserting that the statements were voluntary and verbatim. (Amended Complaint ¶179-180).

The Conviction Integrity Unit of the District Attorney's Office stipulated that Defendant Det. Pitts habitually committed this same type of misconduct during the majority of his decades long career in the Homicide Unit.[6] (Amended Complaint ¶181-182, 184).

As set forth in the Amended Complaint, these exact same tactics were used by Defendant Detectives during the interrogations of Plaintiff, Cardona and Iezzi (Amended Complaint ¶64, 68, 70,75-77,79, 84,86, 88, 115, 171-172) and during the line ups of Colbridge, Stiess, and Brewington (Amended Complaint ¶ 23-27).

---

[5]    This manipulation of evidence often included the Detectives pointing to a specific picture in an array or putting the suspect's picture in multiple arrays. When, an eyewitness was unable to identify the pre-ordained suspect, it was deemed a '*mis*-identification' by the witness rather than the witness being unable to identify a suspect. (Amended Complaint ¶171; Exhibit B).
[6]    This fact was stipulated to by the Conviction Integrity Unit of the District Attorney's Office in *Commonwealth v Brandon Sawyer*. CP-51-CR-0012941-2011.

The use of these tactics directly resulted in Plaintiff's giving a false, coerced confession, which in turn formed the basis for his arrest, prosecution, and conviction. These tactics also directly resulted in the eyewitnesses identifying Plaintiff as the second robber rather than Waters. Their identification was used at trial to convict the Plaintiff.

### 2. **Pattern and practice of not disclosing officers' history of misconduct**

Plaintiff also alleged, that at all times material, supervisory Defendants were aware that Defendant Dets. Pitts and Jenkins had histories of misconduct which were not disclosed to the defense. The Plaintiff has alleged in his Amended Complaint in great detail, dozens of examples of just some of the acknowledged misconduct perpetrated by both Defendant Det. Pitts and Det. Jenkins.

There have been multiple criminal cases wherein it has been determined that Defendant Dets. Pitts coerced false statements through the use of verbal threats and physical force. (Amended Complaint ¶109-110, 184(f),(j), (k),(l), (m),(o), (p), (v), (w),(y), (z), (aa)). In at least three cases, statements taken by Defendant Det. Pitts were suppressed and/or excluded by the criminal courts, and/or rejected by a jury, due to evidence of those statements being false and/or the result of Defendant Pitts' coercion. (Amended Complaint ¶113, 184(h), (q)). In one such case (*Commonwealth v Dwayne Thorpe*) the PCRA court overturned Thorpe's conviction and specifically recognized that Defendant Det. Pitts "continuously and systematically" used abusive tactics to coerce false statements and confessions. (Amended Complaint ¶184(x)).

The misconduct perpetrated by Defendant Det. Pitts was the subject of six (6) civil lawsuits, resulting in the City of Philadelphia paying more than $1.8 million to the Plaintiffs in those cases. (Amended Complaint ¶111, 184(b), (d), (i)).

There have also been multiple founded/sustained Police Internal Affairs investigations alleging similar abuse by Defendant Det. Pitts which pre-dated Plaintiff's trial. The Commonwealth stipulated during the criminal proceedings that this information was not disclosed to the Plaintiff. (Exhibit D: Cmwth. Stipulation ¶Amended Complaint ¶184(c), (e),(g), (n),(r), (s), (t), (u), (aa), (bb), (cc), (dd).

Defendant Det. Jenkins has a similar misconduct history significant for holding vulnerable minors in the Homicide Unit and isolating them from family and coercing false identifications and statements from witnesses. (Amended Complaint ¶185 (a). Notably, the City of Philadelphia settled a lawsuit filed by a wrongly convicted teenager who alleged that Defendant Det. Jenkins coerced witnesses in his case into making false statements. That conviction was ultimately overturned. (Amended Complaint ¶185(c)).

 In addition to the above, there were multiple other instances, including but not limited to the instant case, wherein Defendant Detectives Pitts and Jenkins worked together to violate Plaintiff and other individuals' rights. (Amended Complaint ¶ 186 (a-g), 187).

### 3. **Custom of failing to supervise Defendant Detectives**

At all times material the Defendant City and former Commissioner Ramsey

adopted and maintained a custom through its' supervisory staff of systemically

failing to enforce the Directives and policies that were in existence in order to

prevent the abuses alleged by the Plaintiff. (Amended Complaint ¶175). This has

resulted in the Defendant Detectives being able to commit misconduct year after

year, decade after decade, with impunity. (Amended Complaint ¶173-174).

Plaintiff has cited and discussed in the section above multiple cases wherein

Defendant Dets. Pitts, Jenkins (and often other Homicide detectives believed to be

John Doe Defendants) used unconstitutional interrogation methods. The use of

these methods was in fact so common that it became a tacit custom within that

unit.

Plaintiff avers that supervisory officers knew that these methods were being

routinely used by Defendant Dets. Pitts and Jenkins but they looked the other way

and/or intentionally failed to correct, discipline, or retrain these detectives on the

proper methods of interrogation. The detectives in fact relied on the supervisors

permitting the conduct. They made no effort to hide their actions from their

supervisors. Moreover, supervisors have vouched for Defendant Det. Pitts in this

and other criminal cases.

### 4. <u>Policy, pattern and practice of failing to adequately discipline Defendant Detectives</u>

While the Defendant City of Philadelphia and former Commissioner Ramsey

did not disclose Defendant Det. Pitts misconduct history, they cannot deny that

they were aware that it existed.

The City of Philadelphia, former Commissioner Ramsey and supervisory

Defendants knew about the multiple sustained IAD findings against Defendant

Dets. Pitts, as well as, the lawsuit against Jenkins. The Commonwealth stipulated

during the criminal proceedings in Plaintiff's case that:

> In general, Internal Affairs ("IA") at the Philadelphia Police Department ("PPD") investigates any complaint against police ("CAP") it receives. If IA sustains the findings— investigative conclusions are approved by the Commanding Officer of IA—the investigation is forwarded to PDD headquarters. When PPD headquarters receives sustained findings from IA, it may, depending on the nature of the sustained findings, issue 75-18s charging wrongdoing and imposing an adverse employment action.
>
> If the employee disputes the charges in the 75-18 or the punishment, he or she may exercise their right to an administrative review hearing before a Police Board of Inquiry ("PBI") composed of other PPD employees. At that hearing PPD carries a burden of proving the allegations in the 75-18. PPD lacks subpoena power to compel a witness to appear at the PBI hearing. A subsequent sustained finding in a short period of time for the same category of misconduct, increases the likely severity of the adverse employment action.
>
> Detective Pitts's IA history currently includes three "sustained" instances of misconduct (two involve separate abuses of authority while investigating homicides, while one was related to an off-duty domestic assault). All three IA investigative conclusions rejected— either explicitly or implicitly— explanations offered by Detective Pitts to IA during the investigations.
>
> *Detective Pitts avoided an adverse employment action on two of the sustained IA findings for abusing his authority because Detective Pitts exercised his right to a PBI hearing, and the PPD did not carry its burden at that hearing*.

(emphasis added)(Exhibit D: Cmwth. Stipulation ¶ 97-99). Despite these

sustained findings the supervisory and policymaking defendants failed to discipline

and/or re-train Defendant Det. Pitts.

The City paid over a million dollars in damages to settle just six civil suits

naming Defendant Det. Pitts (Amended Complaint ¶111, 184(b), (d), (i)). Despite those settlements the PPD did not discipline, fire or re-train the Defendant. Instead, they permitted him to continue to investigate homicide cases.

Moreover, Defendants City of Philadelphia and former Commissioner Ramsey clearly knew about Defendant Det. Pitt's history of misconduct in that he was put on a secret "Do Not Call" list by the District Attorney's Office. This list included officers who the District Attorney's Office had determined to be insufficiently credible to put on the stand. That list was transmitted to the police department but was not released to the public.[7] Rather than terminating Defendant Det. Pitts at that time, instead the PPD secretly transferred him to a desk job at an unrelated agency where he would continue to receive his full salary and benefits. It was not until after he was finally indicted by a grand jury that he was ultimately terminated.

Defendant Det. Jenkins remains an active Homicide detective as of this date.

### 5. <u>Policy, practice and custom of intentionally not documenting and/or disclosing certain evidence</u>

Defendant, the City of Philadelphia, not only failed to take appropriate remedial measures to prevent the misconduct alleged in this case, but it has also affirmatively adopted official policies that encouraged and helped foster such misconduct. (Amended Complaint ¶118, 188-189). Plaintiff avers that there

---

[7]     The existence of the secret list was ultimately disclosed in a Philadelphia Inquirer Report.

is a well-established practice and custom within the Homicide Unit of not

documenting and/or disclosing certain evidence that the Defendants did not

consider helpful to the Commonwealth and/or which would assist the defense.


### i.   <u>Logbook</u>

Police Department policy requires that the Detectives write the name and

time that a witness is brought to Homicide in a log book. (Exhibit F). This policy

does not require the witness to personally sign the logbook or in any way confirm

that their name, the date and time are accurately written by the detectives. This

allows detectives to manipulate the logbook and gives the detectives the ability to

then falsely deny that a witness was in the Homicide Unit and/or that the witness

gave an undocumented statement.

In the case at bar, Defendant Detectives did not place Cardona, Brown

and/or Iezzi's names in the logbook.  (Amended Complaint ¶61).  Cardona

testified during the suppression hearing and at Plaintiff's trial that she, Brown and

Iezzi had been inside the Homicide Unit while the Plaintiff was being interrogated

and could hear his cries. (Amended Complaint ¶66). Cardona further testified that

the Defendant Detectives interrogated her and attempted to intimidate and/or

coerce her into falsely identifying the Plaintiff from the video and still photograph.

(Amended Complaint ¶67-79). Defendant Detectives and the Commonwealth

proceeded to argue that Cardona's testimony was not credible because her name

did not appear in the logbook.

## ii.    <u>Interviews and interrogations</u>

At all material times hereto, there was no official comprehensive policy pertaining to interviews and interrogations. PPD Directive 5.23, Interviews and Interrogations – Rights of Individuals and Duties of Law Enforcement, was first issued on 1/1/14 – after Plaintiff's investigation and prosecution. According to that Directive, "(t)his policy is to provide clear and concise standards and procedures for conducting interviews and interrogations by members of the Philadelphia Police Department to safeguard the constitutional rights of all individuals while ensuring the correct offenders are identified, arrested and prosecuted." (Exhibit E).

This lack of policy resulted in important evidence not being documented in Plaintiff's case. For example, what transpired within the interrogation room during the seven and half hour pre- interrogation period prior to Plaintiff's formal interrogation began was not documented anywhere. (Amended Complaint ¶65, 90). Lengthy pre-interview detention such as that used in this case, was regularly used by Homicide detectives to physically and emotionally tire and cause discomfort to the suspect. This wears the suspect down and makes him or her more receptive to saying and doing whatever the detectives ask him or her to.

Moreover, there was not any documentation that any supervisory staff checked on Plaintiff's well-being during that seven-and-a-half-hour pre-interrogation period of time, during the interrogation itself, or during the lengthy period of time he was detained in the Unit *after* the statement was taken. (Amended Complaint ¶92).

Defendant Detectives interviewed Plaintiff's sister. They obtained information from her about Plaintiffs whereabouts. They also had her review the still photograph taken from the video in order to identify that person. Rather than codifying what she told them in a discoverable, verbatim[8], sworn statement which could be used on cross-examination by the defense, the Defendant Detectives only documented the interview in an Activity Sheet. The Activity Sheet contained only hearsay which was not subject to cross examination.  (Amended Complaint ¶48-50, 52).

### iii.    Identity of police witnesses

In January 2009 – four years *prior* to Plaintiff's arrest and trial in 2013 - the Philadelphia Police Department, by and through Defendant, Former Police Commissioner Charles Ramsey, implemented a written policy that required supervisors to remove  the names of all police witnesses who may possess exculpatory information from all case documents and to include only the names of those officers that are necessary "for the _successful_ outcome of the case"  (Amended Complaint ¶119).

This policy encourages detectives to cover up and ignore exculpatory evidence. (Amended Complaint ¶190). The policy enforces a code of silence or "blue code," which prohibits defendants from discovering the identity of

---

[8]    The majority of statements are in the Detectives' handwriting and not the witness/suspects. Moreover, statements are not taken 'verbatim' contrary to written PPD policy and the sworn representations of the Defendants Detectives in other cases. See *Nafis Pinkney v Det. James Pitts, et al*. U.S.D.C. Ed.PA. No. 655).

Officers who possess exculpatory information. That in turn prevents the disclosure of that exculpatory evidence to the defense, violating a defendants' constitutional rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. US*, 405 U.S. 150 (1972). (Amended Complaint ¶121-127).

### iv.   **Financial and professional compensation**

On January 28, 2009 Defendant former Commissioner Ramsey implemented an Overtime Management Policy (09-01) which had the effect of encouraging officers, including the Defendant Homicide Detectives, to do whatever it took to "clear" cases. "Clearing" a case only means that a defendant was identified and referred to the DA's Office for prosecution. Plaintiff avers that the policy encouraged the Defendant Detectives to find someone to identify and refer charges against even that individual if that was not the 'right' person. Not only did this practice advance the detectives' status within the Homicide Unit and the PPD generally, but it also resulted in the detectives receiving significant amounts of overtime pay. (Exhibit A).

Plaintiff avers that had it not been for the above cited policies, practices and customs, the outcome of the criminal proceedings would have been different.

Defendant Det. Pitts and Jenkins would not have been employed as Homicide Detectives much less left virtually unsupervised during the investigation of the instant robbery/homicide.

Plaintiff would not have been verbally and physically abused and coerced into falsely confessing to the crime.

Cardona's testimony at the suppression hearing and trial would have been corroborated by the Homicide Log and would have likely been believed.  This would have resulted in the suppression of the false confession which was the sole evidentiary basis of the arrest warrant and the primary basis for the prosecution.

The eyewitnesses inability to identify the Plaintiff in the line ups would have been determined to be a non-identification rather than a 'mis-identification'. A non-identification would have required the Defendant Detectives to include Waters in the lineup.

Waters would have been identified as a more likely alternative suspect and evidence corroborating Water's ability and motive to commit the crime could have been presented. Plaintiff would not have been convicted and spent over eleven years of his life incarcerated.

Thus, the above cited policies, practices, and customs individually and/or collectively prejudicially injured the Plaintiff and entitle him to relief.

## C. **Relief under the Pennsylvania Constitutional Violation**

 In Count I of the Amended Complaint the Plaintiff alleged violations of the Pennsylvania Constitution. The Defendants have alleged that Plaintiff is not entitled to relief based upon a violation of the Pennsylvania constitution. The Plaintiff agrees and accordingly moves to withdraw that portion of the claim.

## D. **Claims against former Commissioner Ramsey**

Plaintiff  named former Philadelphia Police Commissioner Charles Ramsey as a defendant "in his official capacity" (Amended Complaint ¶ 7). Plaintiff has not

asserted a claim based on Ramsey's individual capacity. Defendant's objection is therefore moot. (Cmwth Motion pg 5-6).

Plaintiff further agrees that the claims against former Commissioner Ramsey in his Official Capacity are duplicative and redundant to the *Monell* claims brought against the City and should therefore be withdrawn.

**E. Malicious prosecution claim arising from the Fourteenth Amendment**

In Count II of the Plaintiff's Amended Complaint, it was alleged that the Defendant Detectives, acting in the course and scope of their employment, used threats, verbal abuse and physical violence to coerce a false confession from the Plaintiff in order to maliciously arrest, prosecute and convict him. (Amended Complaint ¶133-136, 145-146). Plaintiff alleged that this violated his Fourth and Fourteenth Amendment rights. (Amended Complaint ¶133-143).

The Defendants argue in the Motion to Dismiss that the existence of a due process right under the Fourteenth Amendment remains an unsettled area of law entitling them to qualified immunity as to the Fourteenth Amendment claim. (Cmwth. Motion pg. 11 citing *Thomas v. City of Philadelphia*, 290 F. Supp. 3d 371, 380-82 (E.D. Pa. 2018)).

Plaintiff concedes that this is the current state of the law and withdraws this malicious prosecution claim only as to the Fourteenth Amendment. Plaintiff's claim of malicious prosecution based on the Fourth Amendment remains and should proceed.

i. **<u>Conclusion</u>**

For those reasons set forth above, the Plaintiff respectfully requests that this Court deny the Defendants' Motion to Dismiss other than as discussed above in relation to C, D and E and permit the remaining claims to proceed. Should this Court however determine that the Amended Complaint is inadequate or otherwise defective the Plaintiff requests permission to further amend the complaint.

/s/ Teri B. Himbaugh              /s/Alan E. Denenberg
Teri B. Himebaugh, Esq.          Alan Denenberg, Esq.
1400 Spring Garden St. #911      1315 Walnut St. #500
Philadelphia PA 19130            Philadelphia, PA 19107
PA ID 53603                      PA ID 54161
(484) 686-3279                   (215) 546-1345
*Counsel for Plaintiff*          *Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| OBINA ONYIAH | : |
| | : |
| *Plaintiff,* | : |
| | : |
| v. | : |
| | : No. 2:22-cv-01556 |
| CITY OF PHILADELPHIA; ET AL., | : |
| | : |
| *Defendants.* | : |
| | : |
| | : |
| | : |

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below, Plaintiff's Response to Defendants' Partial Motion to Dismiss, Memorandum of Law in support thereof, and Proposed Form of Order were filed via the Court's electronic filing system and are available for downloading.

Date: December 16, 2022                    Respectfully submitted,

/s/Alan E. Denenberg
Alan E. Denenberg, Esq
Attorney for Plaintiff, Daniel Newberg
1315 Walnut Street
Suite 500
Philadelphia, Pa. 19107
215-546-1345