IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| OBINA ONYIAH | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, ET AL. | : | NO. 22-1556 |

## MEMORANDUM

**Padova, J.**                                                                                                                             **March 10, 2023**

Plaintiff Obina Onyiah commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Defendant the City of Philadelphia (the "City"), former Philadelphia Police Commissioner Charles Ramsey, and several individual detectives/police officers after Plaintiff was sentenced to life in prison without parole and spent over eleven years in prison in connection with a murder for which he was subsequently exonerated.[1] Plaintiff alleges that his conviction was based on a coerced confession, false testimony, and the withholding of exculpatory evidence. Presently before the Court is a Partial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by the City and Defendants Detective Ohmarr Jenkins, Detective Thurston Lucke, and former Commissioner Ramsey (collectively, the "City Defendants"). For the reasons that follow, the Motion is dismissed as moot in part, granted in part, and denied in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The Amended Complaint alleges the following facts. On October 21, 2010, Kevin Turner and one accomplice attempted to rob a jewelry store in Philadelphia. During the attempted robbery, Turner and the store owner, William Glatz, were shot and killed. The accomplice survived and fled the scene. Three witnesses present at the time of the robbery described the

---

[1] The named detectives/police officers are Defendants James Pitts, Ohmarr Jenkins, and Thurston Lucke. The Amended Complaint also lists as Defendants Detectives/Police Officers John Does 1-10 and Police Captain/Lieutenant John Does 1-5.

accomplice as younger and shorter than Turner who was 6'1". They each described the accomplice as approximately 5'8".

Following the attempted robbery, Defendant Detective Lucke obtained surveillance video from the store and extracted stills of the accomplice's profile from the video. Two days later, on October 23, 2010, a tip led investigators to Donte Waters, who is 5'9", has a 2008 robbery conviction, and was not incarcerated on the date of the attempted robbery. When presented with a photo array of suspects including Waters, two of the eyewitnesses identified Waters as the accomplice. As a result, on October 24, 2010, Lucke, Jenkins, and Defendant former Detective James Pitts (together, the "Named Detectives") searched Waters's residence and found clothing and a hat consistent with descriptions of the accomplice. Despite the evidence against him, however, the Named Detectives never interviewed Waters.

On October 25, 2010, Donnell Cheek, who was then incarcerated at a federal detention center and saw the surveillance video on television, identified Plaintiff as the accomplice. Plaintiff is 6'3". On November 8, 2010, the Named Detectives searched Plaintiff's mother's home and found no relevant evidence, yet they took Plaintiff's sister to the Homicide Detectives' Unit for an interview. Defendants Pitts and Jenkins wrote a summary of the interview, which stated that Plaintiff's sister had identified Plaintiff as the accomplice from the surveillance video. Plaintiff's sister denies ever identifying her brother as the accomplice.

As a result of Plaintiff's sister's alleged identification, the Named Detectives took Plaintiff into custody, transported him to the Homicide Detectives' Unit, placed him in an interrogation room, handcuffed him to a table, and left him alone. The Named Detectives then searched the home of Plaintiff's then-girlfriend, Katherine Cardona. Cardona was present at the time of the search, as was her friend, Robert Iezzi, Jr., and her landlord, Anthony Brown. The Named

Detectives found no relevant evidence in Cardona's home. Nevertheless, upon completion of the search, the Named Detectives transported Cardona, Iezzi, and Brown to the Homicide Detectives' Unit.

The Named Detectives brought Cardona into an interrogation room where they told her that Plaintiff was wanted for murder and threatened that her children would be removed from her custody if she lied for Plaintiff. They then showed Cardona a still from the surveillance video and asked her to identify Plaintiff as the accomplice. Cardona stated that Plaintiff was not the man in the photograph. In response, the Named Detectives called Cardona "a fucking whore" and placed her on a bench approximately 30 feet away from the room where Plaintiff was held. (Am. Compl. ¶ 70.) Meanwhile, the Named Detectives handcuffed Iezzi and placed him in an interrogation room next to the room where Plaintiff was held.

The Named Detectives then began interrogating Plaintiff, who at that point had been handcuffed to a table for 7.5 hours. The Named Detectives stated that they knew that Plaintiff and Turner had murdered Glatz while attempting to rob the jewelry store. Plaintiff denied having any knowledge of either the crime or Turner. In response, Defendant Pitts yelled aggressively at Plaintiff, spit in his face, and punched him three times in the chest and twice in the shoulders. Defendants Jenkins and Lucke watched Pitts assault Plaintiff and failed to intervene. Eventually, to stop the assault, Plaintiff falsely confessed that he was the accomplice. The Named Detectives then asked Plaintiff to identify certain individuals from photographs. When Plaintiff stated that he did not know the individuals, Pitts, in full view of Jenkins and Lucke, grabbed the back of Plaintiff's neck and forced his head between his legs. Plaintiff screamed, but neither Jenkins nor Lucke intervened. Once again, in order to stop the assault, Plaintiff falsely stated that he knew the men in the photographs.

Both Cardona and Iezzi heard the sounds of punches and Plaintiff's screams. Cardona also heard the Named Detectives say, "stop f'ing around and tell us the truth," and Plaintiff reply, "yo man I ain't do nothing." (Id. ¶ 86.) At one point, a detective exited the interrogation room and said something to the effect of, "I can't do this anymore . . . . this is not our guy." (Id. ¶ 87.)

As a result of Plaintiff's coerced confession on November 8, 2010, he was charged with the attempted robbery and related offenses two days later, on November 10, 2010. On May 10, 2013, Plaintiff's defense attorney moved to suppress Plaintiff's coerced confession. Cardona testified at the suppression hearing, but because the Named Detectives did not record Cardona's name in the daily Homicide Unit Logbook, the court did not believe her testimony and subsequently denied Plaintiff's motion to suppress.[2] On May 31, 2013, a jury convicted Plaintiff of second-degree murder, three counts of robbery, conspiracy to commit robbery, and violation of the Uniform Firearms Act.

On May 9, 2016, after Plaintiff's conviction was affirmed on direct appeal, Plaintiff filed a timely pro se Post-Conviction Relief Act petition, raising claims including actual innocence and a coerced confession. The District Attorney's Office Conviction Integrity Unit investigated Plaintiff's case and filed joint stipulations of fact with Plaintiff. On May 4, 2021, Philadelphia County Court of Common Pleas Judge Tracy Brandeis-Roman vacated Plaintiff's conviction and approved the dismissal of the charges against him.

The Amended Complaint contains seven Counts, all of which are grounded in 42 U.S.C. § 1983. Count I asserts a claim against the Named Detectives for using threats and physical violence

---

[2] The Amended Complaint does not explicitly state that Plaintiff's motion to suppress his confession was denied, but the state court record is clear that Judge "Sandy L.V. Byrd denied the motion and a jury trial commenced on May 23, 2013." Commonwealth v. Onyiah, No. 3010 EDA 2013, 2015 WL 5971352, at *6 (Pa. Super. Ct. Sept. 28, 2015).

to coerce a false confession from Plaintiff in violation of the Due Process Clause of the Fourteenth Amendment and the Pennsylvania Constitution. Count II asserts a claim against the Named Detectives for malicious prosecution in violation of the Fourth and Fourteenth Amendments. Count III asserts a claim against the Named Detectives for failure to disclose exculpatory evidence relating to the circumstances surrounding Plaintiff's false confession in violation of Brady v. Maryland, 373 U.S. 83 (1963), and/or United States v. Giglio, 405 U.S. 150 (1972). Count IV asserts a claim against the Named Detectives for a failure to intervene to prevent violations of Plaintiff's rights to be free from malicious prosecution and coerced confessions in violation of the Fourth and Fourteenth Amendments. Count V asserts a civil rights conspiracy claim against the Named Detectives.[3] Count VI asserts a supervisory liability claim against John Doe Police Captain/Lieutenants. Count VII asserts a municipal liability claim against the City and former Commissioner Ramsey pursuant to Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).

The City Defendants move to dismiss several aspects of the Amended Complaint, including Count IV as against Jenkins and Lucke and Count VII. In response, Plaintiff concedes that the Amended Complaint is subject to dismissal in certain respects and requests to withdraw the following: (1) Count I to the extent it seeks monetary damages under the Pennsylvania Constitution; (2) Count II insofar as it asserts a malicious prosecution claim under the Fourteenth Amendment; and (3) Count VII as against former Commissioner Ramsey. Thus, those portions of the Amended Complaint are withdrawn and the Motion is dismissed as moot insofar as it seeks dismissal of the withdrawn claims. Plaintiff, however, opposes the Motion insofar as it seeks dismissal of (1) Count IV against Jenkins and Lucke, and (2) Count VII against the City.

---

[3] The Amended Complaint also asserts Counts I through V against Defendants Detectives/Police Officers John Does 1-10.

5

## II. LEGAL STANDARD

When deciding a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). "We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." Shorter v. United States, 12 F.4th 366, 371 (3d Cir. 2021) (citing Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). However, we "are not bound to accept as true a legal conclusion couched as a factual allegation." Wood v. Moss, 572 U.S. 744, 755 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," which "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (first quoting Fed. R. Civ. P. 8(a)(2); then quoting Conley v. Gibson, 355 U.S. 41, 47 (1957) (second alteration in original)). The complaint must allege "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'" Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 269 (3d Cir. 2020) (quoting Twombly, 550 U.S. at 555).

**III.    DISCUSSION**

    A.    <u>Count IV against Jenkins and Lucke</u>

Count IV of the Amended Complaint is grounded in 42 U.S.C. § 1983, which "provides remedies for deprivations of rights established in the Constitution or federal laws." <u>Kaucher v. Cnty. of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006). Section 1983 "does not, by its own terms, create substantive rights." <u>Id.</u> (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 145 n.3 (1979)). Consequently, in order to state a claim for relief pursuant to § 1983, a plaintiff must allege that "the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." <u>Id.</u> (citing <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999), and <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995)). It is also incumbent on the plaintiff to "identify the exact contours of the underlying right said to have been violated." <u>Berg v. Cnty. of Allegheny</u>, 219 F.3d 261, 268 (3d Cir. 2000) (quotation omitted).

In Count IV, Plaintiff asserts that the Named Detectives are liable, pursuant to § 1983, as bystanders for failing to intervene in Plaintiff's coerced confession and malicious prosecution in violation of the Fourth and Fourteenth Amendments. Specifically, Plaintiff maintains that Lucke and Jenkins were present when Pitts "obtained the false confession from Plaintiff through the use of verbal and physical force" and "knew or should have known that any beating of a false confession out of a suspect . . . cannot serve as the basis for probable cause to arrest and charge," yet neither Lucke nor Jenkins intervened to ensure that Plaintiff's statement was taken voluntarily and/or that probable cause existed to charge Plaintiff. (Pl.'s Resp. at 23-24 of 45.) The City Defendants move to dismiss Count IV, as against Jenkins and Lucke, on the grounds that the two detectives are entitled to qualified immunity.

"The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." Pearson v. Callahan, 555 U.S. 223, 244 (2009). Our determination as to whether a government official is entitled to qualified immunity involves two inquiries: (1) whether the facts alleged in the complaint "make out a violation of a constitutional right" and (2) whether that right "was clearly established at the time of [the] defendant's alleged misconduct." Montanez v. Thompson, 603 F.3d 243, 250 (3d Cir. 2010) (quoting Pearson, 555 U.S. at 232). These two steps do not have to be considered in this order. Id. (quoting Pearson, 555 U.S. at 236).

A "clearly established right" is one "defined with specificity," rather than "'at a high level of generality.'" City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kisela, 138 S. Ct. at 1153 (quoting Plumhoff v. Rickard, 572 U.S. 765, 778-79 (2014)). "While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate." Dist. of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (quotation omitted). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 611 (2015) (alteration in original) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)).

The City Defendants argue that Count IV of the Amended Complaint is barred by qualified immunity as against Jenkins and Lucke because there is no clearly established constitutional obligation to intervene in a coerced confession or malicious prosecution. They acknowledge that

8

a constitutional claim for failure to intervene has been recognized in connection with excessive force claims, but they maintain that the same principle has not clearly been extended beyond that Eighth Amendment context.[4] Plaintiff counters that the duty to intervene is clearly established in the context of Fourth and Fourteenth Amendment violations, pursuant to the United States Court of Appeals for the Third Circuit's holding in Smith v. Mensinger, 293 F.3d 641 (3d Cir. 2002), as well as other appellate and district court cases.

Just last year, in Ogrod v. City of Philadelphia, 598 F. Supp. 3d 253 (E.D. Pa. 2022), we considered this same issue by analyzing Smith and its progeny. Id. at 272-73. In Smith, the Third Circuit held that a police officer could be liable pursuant to § 1983 and the Eighth Amendment for failure to intervene in a beating, explaining that "[c]ourts have held that a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." 293 F.3d at 650. Since Smith, the Third Circuit has observed that it has not extended failure-to-intervene liability to the false arrest context, i.e., to hold an officer liable under § 1983 for failing to intervene when another officer arrested the plaintiff without probable cause. Lozano v. New Jersey, 9 F.4th 239, 246 n.4 (3d Cir. 2021); see also Ekwunife v. City of Philadelphia, 245 F. Supp. 3d 660, 673 (E.D. Pa. 2017) (finding no legal basis for a conclusion that "a failure-to-intervene claim exists under federal . . . law . . . where a prosecutor allegedly failed to intervene to correct false information in an affidavit of probable

---

[4] To the extent that Plaintiff may assert a claim for failure to intervene in the excessive force context, the City Defendants maintain that "any such claim is barred by the applicable [two-year] statute of limitations," because the claim would have accrued in 2010 when the assault is alleged to have occurred. (Defs.' Mem. at 9 (citing Farrow v. City of Philadelphia, Civ. A. No. 20-5792, 2021 WL 2778554, at *1-2 (E.D. Pa. July 1, 2021).) In response, Plaintiff does not assert that his failure to intervene claim rests on Pitts's alleged use of excessive force; rather, he asserts only that the Named Detectives are liable for failing to intervene to prevent his coerced confession "from being made and relied upon in [his] trial." (Pl.'s Resp. at 29 of 45.) Accordingly, we only analyze Plaintiff's failure to intervene claim as one falling outside the realm of excessive force.

9

cause submitted by a police officer"); cf. Ekwunife v. City of Philadelphia, 756 F. App'x 165, 170 (3d Cir. 2018) (assuming without deciding that a failure to intervene claim could be asserted against an officer who served a deficient arrest warrant).

As we observed in Ogrod, district courts within the Third Circuit, relying on this Circuit precedent, have concluded that police officers have no clearly defined duty to intervene outside of the Eighth Amendment excessive force context. See Ogrod, 598 F. Supp. 3d at 273. For example, in Thorpe v. City of Philadelphia, Civ. A. No. 19-5094, 2020 WL 5217396 (E.D. Pa. Sept. 1, 2020), the court rejected the plaintiff's argument that Smith had put the defendants on notice that they were obligated to intervene in the face of another officer's fabrication and withholding of evidence, observing that "this line of reasoning runs the risk of defining the clearly established law 'at a high level of generality,' which the Supreme Court has long[] instructed courts not to do." Id. at *10 (quoting Bland v. City of Newark, 900 F.3d 77, 83 (3d Cir. 2018)). The court also observed that the plaintiff's position was that the defendants' duty to intervene "exists for the entire duration of the investigation and prosecution—rather than the fleeting moment in time afforded an officer in the presence of unconstitutional physical action," and it noted that this attempt to impose a duty over such a long time period "exemplifies the heightened generality of the proposition." Id. at *10. Thus, the court concluded that "it was not sufficiently clear that reasonable officers would have understood that failing to intervene when confronted with another's fabrication and withholding of evidence violated [the plaintiff's] constitutional rights," and it found that the defendant officers were entitled to qualified immunity with respect to the plaintiff's failure to intervene claims. Id. at *11.

In a second district court case, Outlaw v. City of Philadelphia, Civ. A. No. 21-1290, 2021 WL 3471168 (E.D. Pa. Aug. 6, 2021), the court relied in part on Thorpe to find that police

10

detectives were entitled to qualified immunity on a claim that they had failed to intervene to prevent a plaintiff's false arrest, malicious prosecution, false imprisonment, and deprivation of liberty. Id. at *7. The court explained that neither its independent research nor the plaintiff's briefing had identified any cases from the Third Circuit that had recognized a constitutional duty to intervene under such circumstances, and it therefore refused to take "impermissible liberties in defining the asserted rights." Id.

Based on all of these cases, we concluded in Ogrod that there was no clearly established duty to intervene outside of the excessive force context, and we reach that same conclusion here. Ogrod, 598 F. Supp. 3d at 273. Nevertheless, Plaintiff urges us here to consider nonbinding precedent outside of this Circuit. See Assaf v. Fields, 178 F.3d 170, 179 (3d Cir. 1999) (suggesting that decisions of other circuits may be consulted to determine the state of clearly established law, but not where "within this court's jurisdiction" we have "numerous opinions to serve as guidance on the subject"). Even considering the precedent that Plaintiff cites from other Circuits, however, we are unable to find a "robust consensus of cases of persuasive authority in the Courts of Appeals that could clearly establish [the] right [at issue] for purposes of qualified immunity."[5] Porter v.

---

[5] Plaintiff cites four appellate court cases from other circuits in support of his position that the Named Detectives had a clearly established duty to intervene in a coerced confession and/or malicious prosecution. See Gragnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982) (applying failure-to-intervene liability in the false arrest context); Yang v. Hardin, 37 F.3d 282, 284 (7th Cir. 1994) (discussing failure-to-intervene liability in the excessive force and unreasonable seizure context); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986) (discussing failure-to-intervene liability in the excessive force context); and Randall v. Prince George's Cnty., 302 F.3d 188, 203-04 n.23 (4th Cir. 2002) (declining to apply failure-to-intervene liability in the unlawful detention context). None of these cases actually involve a failure to intervene in the context of a coerced confession and/or malicious prosecution or are otherwise "clear enough that every reasonable official would interpret [them] to establish the particular rule the plaintiff seeks to apply." Wesby, 138 S. Ct. at 590 (citation omitted).

Pennsylvania Dep't of Corr., 974 F.3d 431, 449 (3d Cir. 2020) (quoting Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 142 (3d Cir. 2017)).

For all of these reasons, we find that there is simply no persuasive authority on which we could conclude that Lucke and Jenkins had a clearly established duty to intervene to prevent Plaintiff's coerced confession or malicious prosecution. We therefore conclude that Jenkins and Lucke did not violate a clearly established right by allegedly failing to intervene in their fellow officers' actions in coercing a confession and pursuing a malicious prosecution. Consequently, we conclude that Jenkins and Lucke are entitled to qualified immunity on Plaintiff's failure to intervene claims and we dismiss Count IV to the extent that it asserts a claim against them on that basis.

B.   Count VII against the City

Count VII of the Amended Complaint asserts a § 1983 claim against the City, pursuant to Monell. To state a § 1983 claim against a municipality, i.e., a Monell claim, a plaintiff must allege that (1) he suffered a constitutional violation and (2) the municipality caused that constitutional violation through a policy, a custom, or a failure to train or other inadequacy. Monell, 436 U.S. at 694; Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403 (1997); City of Canton v. Harris, 489 U.S. 378, 388-89 (1989); Reitz v. Cnty. of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." Simmons v. City of Philadelphia, 947 F.2d 1042, 1059 (3d Cir. 1991) (alteration in original) (quoting Monell, 436 U.S. at 690). "A custom is an act 'that has not been formally approved by an appropriate decision-maker,' but that is 'so widespread as to have the force of law.'" Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Bryan Cnty., 520 U.S. at 404); see also Brown v. Muhlenberg Twp.,

12

269 F.3d 205, 215 (3d Cir. 2001) ("A custom . . . must have the force of law by virtue of the persistent practices of state [or municipal] officials." (quotation omitted)). A plaintiff need not allege that an unconstitutional municipal policy or custom exists to proceed on a failure to train or other inadequacy theory. Forrest v. Parry, 930 F.3d 93, 105 (3d Cir. 2019) (explaining that other inadequacies include a failure to supervise or discipline) (citing Est. of Roman v. City of Newark, 914 F.3d 789, 798-99 (3d Cir. 2019))). Nevertheless, under any theory of Monell liability, a plaintiff must allege that the municipal body employed the deficient policy, custom, or other inadequacy with "deliberate indifference" to the constitutional deprivations it caused. City of Canton, 489 U.S. at 388-89 ("'[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." (alteration in original) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 483-484 (1986) (plurality)) (citation omitted). Generally, Plaintiffs can plead such deliberate indifference by alleging that decision-makers knew that similar constitutional deprivations had previously occurred and were aware of ways to prevent them, "but either deliberately chose not to pursue these alternatives or acquiesced in a long-standing policy or custom of inaction in this regard." Beck v. City of Pittsburgh, 89 F.3d 966, 972 (3d Cir. 1996) (emphasis omitted) (quoting Simmons, 947 F.2d at 1064).

In Count VII, Plaintiff identifies multiple policies, customs, and inadequacies that he asserts caused his coerced confession and/or malicious prosecution. We distill two clear theories of Monell liability in Plaintiff's allegations: (1) a custom and failure to train, supervise, or discipline relating to the use of unconstitutional methods of interrogation, and (2) a written policy, custom, and failure to train, supervise, or discipline concerning the handling of exculpatory evidence. (Am. Compl. ¶¶ 121, 172, 190.) The City Defendants move to dismiss Count VII in its

entirety on the grounds that Plaintiff has failed to identify the alleged policies or practices with the requisite specificity, and has failed to "demonstrate a causal link between any [of the City's] alleged failures" and his alleged constitutional deprivations. (Defs.' Mem. at 12.) In the alternative, the City Defendants move to dismiss Count VII insofar as it rests on violations of rights that are not clearly established, i.e., malicious prosecution in violation of the Fourteenth Amendment and failure-to-intervene liability.

1. Unconstitutional Interrogation Methods

Plaintiff's Monell claim primarily challenges the City's conduct relating to the alleged use of unconstitutional methods of interrogation by Homicide Unit officers that result in coerced confessions and false witness statements. Specifically, Plaintiff alleges that the City had a custom or practice "of condoning and/or acquiescing to law enforcement officers['] use [of] unconstitutional methods when interrogating suspects and/or witnesses," and that the City failed to train, supervise, or discipline Homicide Unit officers regarding the constitutional limits of interrogation. (Am. Compl. ¶ 172.) As a result of these actions and omissions, Plaintiff avers that Homicide Unit officers used unconstitutional methods of interrogation, including "excessive detention without food, water, and/or access to a bathroom; the use of fabricated evidence [during the questioning]; [and] verbal threats, excessive berating, and/or physical assault." (Id. ¶¶ 171-72.) Plaintiff alleges that the City's conduct therefore caused his own constitutional injuries because the Named Detectives subjected him to those same unconstitutional methods during his interrogation, in order to elicit his false confession and pursue his malicious prosecution.

The Amended Complaint identifies and describes forty circumstances between 2001 and 2013 in which former Detective Pitts and/or Detective Jenkins allegedly employed unconstitutional methods of interrogation, i.e., excessive detention and/or verbal and physical

assault, to obtain a false confession or false witness statement. Based on this "lengthy list of complaints against Former Detective Pitts and Detective Jenkins regarding conduct similar to that alleged in Plaintiff's Amended Complaint," Plaintiff contends that the City had notice of a custom and inadequacy relating to the use of unconstitutional methods of interrogation, yet it failed "to take steps to terminate said practices." (Id. ¶¶ 175, 188.) Plaintiff also specifically alleges that the City's failure to train Homicide Unit officers on constitutional methods of interrogation amounted to deliberate indifference because the need for such training was "obvious" given the list of "formal and informal complaints being filed against the [Named Detectives]." (Id. ¶ 174.)

At this early stage of the proceeding, these allegations are more than sufficient to plausibly state a claim for Monell liability based on a custom and a failure to train, discipline, or supervise relating to unconstitutional interrogation methods. Specifically, Plaintiff has pled sufficient facts to support the reasonable inference that (1) the City had a custom and/or other inadequacy relating to Homicide Unit officers' use of unconstitutional interrogation methods; (2) the City's actions or omissions proximately caused Plaintiff's constitutional deprivations because the Named Detectives subjected Plaintiff to those same unconstitutional methods; and (3) the City's conduct amounted to deliberate indifference because it knew that its officers had used unconstitutional interrogation methods in the past, and yet it failed to take precautions against the use of those methods in the future. Thus, we conclude that Plaintiff has stated a cognizable Monell claim based on the City's alleged custom and failures to train, supervise, and/or discipline officers relating to unconstitutional methods of interrogation. Defendants' Motion is therefore denied insofar as it seeks dismissal of those claims.

### 2. Exculpatory Evidence

Count VII also contains allegations concerning the City's handling of exculpatory evidence. Unlike the allegations discussed above, however, these allegations are scattered and difficult to parse. For example, Plaintiff alleges that the City, through former Commissioner Ramsey, promulgated an unconstitutional written policy in January 2009 whereby supervisors were instructed to review investigative reports and "ensure that only those *officers/investigators* who are necessary for the successful outcome of the case are listed." (Am. Compl. ¶ 119 (emphasis added) (quoting Am. Compl. Ex. A).) According to Plaintiff, this policy encouraged supervisors "to remove from all police paperwork the names of all police *witnesses* who possess exculpatory information." (Id.) Based on the text of the alleged policy, however, we cannot reasonably infer that it played any role in the documentation of witnesses' names during an investigation. Moreover, Plaintiff does not allege that the names of any officers/investigators have been removed from the investigative reports relating to his criminal case. Therefore, we cannot reasonably infer that the alleged written policy had any effect on Plaintiff's criminal proceedings.

Plaintiff also alleges that the City had a custom of withholding exculpatory evidence from the District Attorney's office and that it failed to train, discipline, or supervise its Homicide Unit officers regarding their duty to disclose exculpatory evidence. (Id. ¶¶ 179-80.) However, in support of these claims, Plaintiff alleges only that the Named Detectives withheld certain exculpatory evidence in *his* criminal case.[6] We cannot reasonably infer, based on Plaintiff's case alone, that the City had a widespread and persistent practice of withholding exculpatory evidence.

---

[6] Plaintiff alleges that former Detective Pitts also withheld exculpatory evidence in one other case, but those additional allegations, which only concern former Detective Pitts and fail to identify what type of exculpatory evidence he allegedly withheld, do not change our analysis. (Am. Compl. ¶ 184(h).)

Natale, 318 F.3d at 584 (quoting Bryan Cnty., 520 U.S. at 404); see also Brown, 269 F.3d at 215. Because Plaintiff only alleges that the Named Detectives mishandled exculpatory evidence in his case, we also cannot reasonably infer that the City knew that similar constitutional deprivations had previously occurred and acted with deliberate indifference in failing to prevent them. Beck, 89 F.3d at 972 (quoting Simmons, 947 F.2d at 1064).

Under these circumstances, we conclude that Plaintiff has failed to allege sufficient facts to show that any policy, custom, or failure to train, supervise, or discipline relating to the City's handling of exculpatory evidence caused his coerced confession or malicious prosecution. The factual allegations contained in the Amended Complaint are simply insufficient "to raise a right to relief above the speculative level," and the new theories of liability that Plaintiff puts forth in his brief do not change this conclusion. Geness, 974 F.3d at 269 (quoting Twombly, 550 U.S. at 555). Consequently, we dismiss Count VII of the Amended Complaint insofar as it asserts a claim for Monell liability relating to the City's handling of exculpatory evidence.

### 3. Clearly Established Rights/Duties

The City Defendants also move for dismissal of Count VII to the extent that it rests upon an alleged constitutional violation that is not clearly established. The existence of an underlying constitutional violation is implicit in any Monell claim. See City of Canton, 489 U.S. at 385 (citing Monell, 436 U.S. at 694-95); Mosca v. Cole, 217 F. App'x 158, 165 (3d Cir. 2007). Here, the City Defendants assert that Plaintiff's Monell claim cannot arise from a constitutional violation that is not clearly established, specifically, (1) failure to intervene in the context of a malicious prosecution or coerced confession, and (2) malicious prosecution in violation of the Fourteenth Amendment. Plaintiff does not respond to this argument.

While the Third Circuit has not yet addressed this issue, Courts of Appeals in other Circuits have held that a municipality cannot be deliberately indifferent to a right that is not clearly established. Szabla v. City of Brooklyn Park, 486 F.3d 385, 393 (8th Cir. 2007) (en banc) ("[A] municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." (citations omitted)); see also Bustillos v. El Paso Cnty. Hosp. Dist., 891 F.3d 214, 222 (5th Cir. 2018) (quoting Hagans v. Franklin Cnty. Sheriff's Off., 695 F.3d 505, 511 (6th Cir. 2012)); Arrington-Bey v. City of Bedford Heights, 858 F.3d 988, 995 (6th Cir. 2017) (explaining that there can be no deliberate indifference under Monell when the constitutional right allegedly violated was not clearly established); Young v. Cnty. of Fulton, 160 F.3d 899, 904 (2d Cir. 1998) (stating that a Monell claim based on "failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right" (citation omitted)).

In Ogrod, we concluded, consistent with other district courts in this Circuit, that where rights are not clearly established, there can be no Monell liability for violations of those rights because there can be no deliberate indifference. Ogrod, 598 F. Supp. 3d at 276; Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 387; see also Outlaw, 2021 WL 3471168, at *8 (citations omitted); Lewis v. City of Philadelphia, Civ. A. No. 19-2847, 2020 WL 1683451, at *12 (E.D. Pa. Apr. 6, 2020) (explaining that "[i]f the right at issue is not clearly established, then any assertion of deliberate indifference is substantially undercut because, by definition, there are no clear constitutional guideposts for the municipality to follow in developing policy" (quotation and internal quotation marks omitted)); Dennis v. City of Philadelphia, 379 F. Supp. 3d 420, 435 (E.D. Pa. 2019) (citations omitted).

Here, as explained above, we are permitting Plaintiff's Monell claims against the City to proceed insofar as they are based on the City's alleged custom and failure to train, supervise, or discipline relating to the use of unconstitutional methods of interrogation. Based on the caselaw above, however, we conclude that Plaintiff's Monell claims cannot rest on the violation of a right that is not clearly established. The City Defendants assert that these relevant, unestablished rights include (1) failure to intervene in the context of a malicious prosecution or coerced confession, and (2) malicious prosecution in violation of the Fourteenth Amendment. Plaintiff has conceded that the Fourteenth Amendment right against malicious prosecution is not clearly established and we agree.[7] In addition, we have already concluded that failure-to-intervene liability is not clearly established in the context of a coerced confession and/or malicious prosecution. Thus, we grant the Motion to Dismiss the Monell claim in Count VII insofar as it rests on failure-to-intervene liability and malicious prosecution in violation of the Fourteenth Amendment, which are not clearly established constitutional violations and therefore cannot form the basis of a Monell claim.

## IV.   CONCLUSION

For the foregoing reasons, the Motion is dismissed as moot in part, granted in part, and denied in part. Specifically, the Motion is dismissed as moot insofar as it seeks dismissal of the claims against the City Defendants in the following portions of the Amended Complaint that Plaintiff has withdrawn: (1) Count I insofar as it seeks monetary damages under the Pennsylvania Constitution; (2) Count II insofar as it asserts a claim for malicious prosecution in violation of the

---

[7] In 2014, the Third Circuit explicitly stated that there was a lack of clarity in its own case law regarding the viability of a Fourteenth Amendment procedural due process claim for malicious prosecution. Halsey v. Pfeiffer, 750 F.3d 273, 290 n.14 (3d Cir. 2014). Based on this Third Circuit authority, we can only conclude that, between 2010 and 2013, when Plaintiff was both interrogated and convicted, it was not clearly established that the Fourteenth Amendment provided for a procedural due process right against malicious prosecution.

Fourteenth Amendment; and (3) Count VII insofar as it asserts a claim against Ramsey. The Motion is granted insofar as it seeks dismissal of (1) Count IV against Jenkins and Lucke; and (2) Count VII to the extent it asserts a claim for <u>Monell</u> liability based on (a) a policy, custom, or failure to train, supervise, or discipline relating to the handling of exculpatory evidence, and (b) failure-to-intervene liability and malicious prosecution in violation of the Fourteenth Amendment. In all remaining respects, the Motion is denied. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.